## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICK HORAN,                       :       CIVIL ACTION NO. 1:22-CV-1166
                                     :
              Plaintiff              :       (Judge Conner)
                                     :
      v.                             :
                                     :
THADDEUS GROSS, *et al.*,            :
                                     :
              Defendants             :

### MEMORANDUM

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983.  Plaintiff, Patrick Horan, alleges violations of his civil rights arising from his transfer to the Camp Hill State Correctional Institution ("SCI-Camp Hill"), revocation of his single-cell status, prison officials' purported denial of mental health care, prison officials' deliberate indifference to Horan's medical needs, and retaliation by prison officials for his filing of grievances and complaints.  Defendants have moved for partial dismissal through two separate motions.  The motion filed by defendant Wanga will be denied.  The motion filed by defendants Gross, Cyrus, Fells, Harry, Jedrzejek, Murray, and Butler ("DOC defendants") will be granted in part and denied in part.

I.    **Factual Background & Procedural History**

Horan filed this case in the Cumberland County Court of Common Pleas on June 23, 2022.  (Doc. 1-1).  Defendants removed the case to this district on July 27, 2022.  (Doc. 1).  According to the complaint, Horan was transferred to SCI-Camp Hill in March 2020 following the closure of SCI-Retreat.  (Doc. 1-1 at 5).  Horan was purportedly given a "Z-Code"—a housing classification that allowed him to not have

a cellmate—while he was in SCI-Retreat.  (Id.)  Upon his transfer to SCI-Camp Hill

his Z-Code was revoked.  (Id.)  He was housed in SCI-Retreat's residential

treatment unit prior to the transfer, but was assigned to general population upon

his arrival at SCI-Camp Hill.  (Id.)

On April 1, 2020, Horan met with defendant Gross, a psychologist employed

by the prison, and explained that he was not supposed to be housed in SCI-Camp

Hill or general population because his sentencing order required that he be housed

in a secure mental health facility with constant psychiatric care due to the fact that

he pled guilty but mentally ill ("GBMI").  (Id. at 6).  Horan filed a request to be

transferred out of the prison.  (Id.)  Defendant Cyrus, a counselor in SCI-Camp Hill,

purportedly stated he could not be transferred until he had been housed there for

two years.  (Id. at 7).

On July 28, 2020, Horan met with Gross at his cell door.  (Id.)  Cyrus

purportedly interrupted this meeting to inform Horan that his Z-Code had been

revoked.  (Id.)  Horan filed a grievance on August 2, 2020, complaining that his Z-

Code was revoked despite no staff member assessing how this would affect his

mental health.  (Id.)  Prison staff denied the grievance based on Horan's purported

failure to inform staff of his mental health status.  (Id.)  Horan met with Gross on

August 11, 2020, to discuss the denial and told him he had "taken a whole bottle of

pills and slit [his] wrists."  (Id.)  Horan allegedly showed Gross the wounds he

suffered as a result of the self-harm.  (Id.)  Gross purportedly did nothing in

response.  (Id.)

Horan met with Cyrus on September 8, 2020 and with Gross on October 6, 2020 to discuss his mental health.  (Id.)  On October 21, 2020, he met with Gross to discuss the constant headaches he was experiencing and his difficulty breathing while exercising.  (Id.)  On October 28, 2020, he met with non-party psychologist Ms. Bowser for an evaluation.  (Id. at 8).  On November 5, 2020, he met with Gross and Bowser to discuss his alleged lack of mental health treatment, his housing concerns, and his headaches and respiratory problems.  (Id.)  On January 4, 2021, he met with Gross to discuss his health concerns.  (Id.)

The complaint alleges that Horan has had several cellmates since the removal of his Z-Code.  On November 12, 2020, an inmate named Tyrell Bowens moved into his cell.  (Id.)  Bowens had previously been confined in the prison's Behavioral Modification Unit after purportedly stabbing his cellmate.  (Id.)  Horan and Bowens met with prison staff the following day to state they were not compatible as cellmates.  (Id.) Bowens was transferred out of the cell.  (Id.)  Horan was subsequently given Matthew Ricketts as a cellmate until January 19, 2021, when prison staff allegedly transferred him out of the cell in response to Horan helping him file a grievance regarding the prison's refusal to place him in a sex offender program.  (Id.)  On January 20, 2021, Kyle Sarginger was moved into Horan's cell.  (Id.)  The complaint avers that Sarginger suffers from Hepatitis C. (Id.)  Horan and Sarginger allegedly remained cellmates until February 9, 2021, when Sarginger was moved out of the cell.  (Id.)  Jeff McLelland, who had recently been housed in the infirmary with a suspected COVID-19 infection, was transferred

to the cell the same day.  (<u>Id.</u> at 9).  Horan and McLelland immediately got into an argument about McLelland smoking e-cigarettes in the cell.  (<u>Id.</u>)

Horan purportedly met with Gross on February 10, 2021, to discuss concerns that prison staff were putting him in danger by giving him cellmates without assessing their compatibility.  (<u>Id.</u>)  On February 25, 2021, approximately 90 inmates were removed from Horan's housing block after testing positive for COVID-19.  (<u>Id.</u>)  McLelland was exhibiting symptoms of COVID-19 at this time, but did not test positive for the virus.  (<u>Id.</u>)  The next day, both Horan and McLelland allegedly became sick with COVID-19.  (<u>Id.</u>)

On March 1, 2021, Horan met with defendant Gross about unspecified threats made by McLelland.  (<u>Id.</u>)  On March 2, 2021, Horan met with defendant Wanga, a psychiatrist in the prison, about threats by McLelland and Horan's belief that he was supposed to be housed in a secure mental health facility.  (<u>Id.</u>)  On March 18, 2021, Horan met with Gross, Wanga, and "Nurse"[1] about the threats by McLelland. (<u>Id.</u>)  On March 24, 2021, McLelland allegedly threatened Horan in an unspecified manner.  (<u>Id.</u>)  Horan reported the threat to Sgt. Boone, who arranged to have McLelland transferred out of Horan's cell.  (<u>Id.</u>)  Gross allegedly acknowledged on March 25, 2021 that he "dropped the ball" with respect to the threats made by McLelland.  (<u>Id.</u>)  On March 29, 2021, an inmate named Corey Clingerman was moved into Horan's cell.  (<u>Id.</u> at 10).

---

[1] It is unclear from the complaint whether this is a reference to an individual named "Nurse" or an unnamed nurse, but we assume the latter.

On April 16, 2021, Horan received an initial review response to a grievance he filed regarding McLelland's purported threats.  (Id.)  The response stated that Horan had never informed Gross of the threats made by McLelland.  (Id.)  Horan spoke with Gross, who confirmed that Horan had informed him about the threats on March 1, 2021 and March 18, 2021.  (Id.)

On April 26, 2021, Horan told an unnamed nurse he was experiencing chest pain resulting from COVID-19.  (Id.)  The nurse allegedly told him the chest pain was not due to COVID-19, but Horan responded that the symptoms had persisted since his COVID-19 infection began on February 26, 2021.  (Id.)

On June 21, 2021, Horan met with a physician's assistant named Karen to discuss "relentless body pain" and respiratory problems that Horan attributed to COVID-19.  (Id.)  Karen prescribed him Celebrex to treat the symptoms.  (Id.)  On June 30, 2021, Horan met with Cyrus for an annual review.  (Id.)  Cyrus purportedly spoke "abusively" towards Horan because Horan would not sign paperwork confirming that he refused a work assignment.  (Id.)  On July 6, 2021, Horan met with a physician's assistant named Amy, who prescribed him Prednisone and said that Horan's arthritis pain could be attributed to his chronic Lyme disease that was exacerbated by COVID-19.  (Id.)  On July 8, 2021, Horan met with Wanga, Gross, and four other prison employees to discuss his mental health, his requested transfer, and his problems with Cyrus.  (Id.)  On July 14, 2021, Horan met with a physician's assistant named Justin to discuss severe headaches, hand numbness, muscle cramps, and pain he was experiencing.  (Id.)  On July 19, 2021, Horan met with Gross to discuss his problems with Cyrus and the medical issues he ascribed to

COVID-19.  (Id.)  On July 27, 2021, Horan again met with physician's assistant Amy and told her he was experiencing severe pain, shakes, and difficulty conducting normal movements or functions.  (Id.)  Amy prescribed him Prednisone and Doxycycline and informed him that he was scheduled to see a doctor.  (Id.)

On August 3, 2021, Horan was given a new cellmate named Greg Hake.  (Id.)  The next day, Counselor Misiti allegedly told Horan that if he did not consent to be vaccinated against COVID-19 he would be moved to I-Block and isolated and his pay for employment would be reduced from $2.52 per day to $0.72 per day.  (Id. at 11).  Horan met with physician's assistant Karen on August 5, 2021, who prescribed him bottom bunk status due to being "crippled from COVID."  (Id.)  On the same day, Horan was purportedly compelled to be vaccinated against COVID-19 despite his objections to the vaccine and his statement that he had underlying immune deficiencies due to chronic Lyme disease.  (Id.)

On August 11, 2021, Horan met with Wanga to discuss his mental health progress, the stress he was experiencing due to alleged lack of mental health treatment at SCI-Camp Hill, and the worsening of his mental health due to his housing situation.  (Id.)  On August 17, 2021, Horan met with Dr. Voorstad to discuss his ongoing concerns with Lyme disease and COVID-19.  (Id.)  Horan told Dr. Voorstad that he was experiencing pain in his hips, neck, shoulders, and hands and that he was having difficulty functioning.  (Id.)  Voorstad submitted a request for Horan to be seen by a rheumatologist.  (Id.)

On August 24, 2021, Horan met with Gross to discuss his stress, his medical issues, and the problems he was experiencing with Cyrus.  (Id.)  On September 4,

2021, Horan took the day off from work because he was in extreme pain, but the medical department allegedly refused to see him. (Id.) He met with physician's assistant Karen on September 7, 2021, and described his extreme pain, cramping, and difficulty functioning. (Id.) Karen increased his prescribed dose of Celebrex. (Id.) On September 21, 2021, Horan met with physician's assistants Amy and Ramirez and told them he was experiencing extreme pain and difficulty functioning. (Id.) They prescribed him Mobic and gave him a medical pass for a new mattress. (Id.) Horan gave the medical pass to his unit manager the next day, who allegedly refused to give him a new mattress. (Id.) On September 27, 2021, Horan had a sick call with physician's assistant Justin, who purportedly told him there was nothing else the medical department could do to treat his extreme pain and difficulty functioning. (Id.) On October 1, 2021, Dr. Voorstad canceled an appointment with Horan. (Id. at 12.) On October 4, 2021, Horan had a sick call with physician's assistant Ramirez to report that something "snapped" in his right thigh while he was working in the prison's butcher shop on September 28, 2021. (Id.) Horan reported he was in constant pain and that he was having difficulty sitting and standing. (Id.)

On October 4, 2021, Horan also met with deputy warden Nicklow about his alleged difficulty getting medical care. (Id.) Nicklow told Horan he would "take care of it." (Id.) On October 6, 2021, Horan met with Dr. Voorstad and told him he was experiencing pain from his thigh injury, chills in his back, and swelling in his hands. (Id.) Voorstad told him he was scheduled to see a specialist. (Id.)

On October 18, 2021, Horan had a sick call with physician's assistant Karen and told her he was having trouble at work because standing caused him pain.  (Id.) He also told her he was experiencing pain in his shoulder, difficulty getting on and off the toilet, and difficulty putting on socks.  (Id.)  Karen stated a doctor would have to approve a request for "work lay-ins" and discussed Fibromyalgia and an increased dose of "Noratrophaline"[2] with Horan.  (Id.)  On October 19, 2021, Horan met with Gross and told him that his constant pain was having a negative effect on his mental health and exacerbating his depression.  (Id.)

On October 27, 2021, Horan spoke with defendant Murray about the medical issues that were making it difficult to work.  (Id.)  Murray allegedly told him he needed to "get something from Medical" in order to not come to work or risk being cited for misconduct.  (Id.)  Horan met with Karen the next day, who put him on medical lay-in until November 2, 2021.  (Id.)  His medical lay-in was subsequently extended to December 3, 2021.  (Id.)

On November 12, 2021, Horan met with Gross, Cyrus, and "Nurse."  (Id.)  He complained about the purported lack of mental health treatment at SCI-Camp Hill, his need for a transfer to another prison, and the medical issues and pain he was experiencing.  (Id.)  On December 5, 2021, Horan met with Dr. Newton to discuss his mental health and the purported lack of treatment he was receiving.  (Id.)

---

[2] The court has been unable to identify any medication by this specific name through independent research.

On December 6, 2021, Horan met with physician's assistant Ramirez and stated he was experiencing chest pain when he sneezed or coughed. (Id. at 13). Ramirez extended his medical lay-in. (Id.)  On December 13, 2021, Horan was transported to Pinnacle Rheumatology where he was seen by Dr. Jajoria. (Id.) Jajoria determined that Horan had problems with his joints and muscles, performed bloodwork, and prescribed Horan medication. (Id.)

On December 17, 2021, physician's assistant Justin cleared Horan to return to work and increased his prescription of Cymbalta. (Id.)  On January 3, 2022, defendant Butler escorted Horan out of the butcher shop and told him that he was no longer employed there. (Id.)  Horan asked why, and Butler allegedly stated, "I don't have to give you a reason." (Id.)  The same day, Horan's former coworker in the butcher shop, Anthony Forsythe, purportedly told him that Butler did not want Horan working there because Horan had filed a grievance against him. (Id.)

On January 3, 2022, Horan had a sick call with physician's assistant Karen, who diagnosed him with rheumatoid arthritis. (Id.)  Horan told her he was experiencing lung pain if he coughed or sneezed, difficulty breathing, numbness and chills in his back, stabbing pain, and constant headaches. (Id.)  Karen ordered chest x-rays and prescribed him Prednisone. (Id.)  The same day, Horan met with Gross and told him about his medical treatment, his employment situation, and problems he was having with his cellmate, Bradley Cook. (Id.)  Gross allegedly stated that Horan and Cook should never have been celled together. (Id.)

On January 4, 2022, Horan spoke with Butler's supervisor, Davis, who told Butler to reinstate Horan to his job in the butcher shop. (Id.)  Butler allegedly told

Horan he "better not" file any more grievances against Butler.  (Id.)  On January 10, 2022, Horan filed a grievance alleging that his pay was $77.26 short.  (Id.)  On January 13, 2022, Horan agreed to drop his grievance after correctional officer Jedrzejek stated Horan would get back pay and that Butler would be reprimanded.  (Id.)  On January 14, 2022, Horan met with Dr. Voorstad, who said that Horan still had "medical issues" and that he needed to be seen by Dr. Jajaria again.  (Id.)

On January 26, 2022, Butler purportedly threatened to fire Horan and said "some people are lucky they are in prison" while pointing his finger at Horan and pretending to shoot him in the face.  (Id. at 14).  Butler also purportedly said that he knew Horan had sent a letter to the prison's Prison Rape Elimination Act ("PREA") coordinator regarding alleged misconduct by Butler.  (Id.)  Horan filed a grievance against Butler for this incident on January 28, 2022, but the grievance was denied.  (Id.)  On January 31, 2022, Horan filed an incident report against Butler.  (Id.)  Ten minutes later, Butler allegedly fired him from the butcher shop.  (Id.)  Horan filed a grievance about the firing, which was denied.  (Id.)  Horan wrote a letter to the PREA coordinator on February 3, 2022, complaining that he was being retaliated against and told Gross about the alleged retaliation on February 10, 2022.  (Id.)

On February 14, 2022, Horan was allegedly removed from his food service job in the prison.  (Id.)  Sgt. Myers purportedly told Horan that he would be cited for misconduct for threatening another inmate named Richard Weber, despite Horan's unit manager allegedly confirming that Horan had not threatened Weber.  (Id.)  Horan was moved to a different housing block after this interaction.  (Id.)  Horan grieved his removal from the food service position on February 18, 2022.  (Id.)  On

February 22, 2022, Horan met with Unit Manager Fells, who allegedly stated there were no grounds for Horan to be dismissed from his position.  (Id.)

On February 25, 2022, Gross came to Horan's cell.  (Id.)  Horan told him he had been trying to see him for ten days since he was moved.  (Id.)  Gross allegedly stated that he was not aware that Horan had been moved and that it was "ridiculous" no one had checked on him given his status as an inmate who pleaded GBMI.  (Id.)  Horan told Gross he was not comfortable having a cellmate.  (Id.)

On March 3, 2022, Horan met with Dr. Jajoria.  (Id. at 15).  Jajoria diagnosed him with rheumatoid arthritis and prescribed Prednisone.  (Id.)  Horan told him he was experiencing constant headaches, pain, dizziness, lightheadedness, and pain in his chest if he sneezed or coughed.  (Id.)

On March 7, 2022, Horan met with Nurse Behe for a psychological evaluation. (Id.)  Horan told her that Camp Hill was not meeting his treatment needs because he was not housed in a secure mental health facility under constant psychiatric care.  (Id.)  Horan told her about his lack of sleep and anxiety and stated he did not want to have a cellmate and that he wished to be transferred.  (Id.)  Behe allegedly stated that she would put in a request for Horan to have a psychiatric referral.  (Id.) Later that day, Horan was given a new cellmate, Paul McLothlin.  (Id.)

On March 10, 2022, Horan met with Wanga, Fells, Cyrus, and "Nurse."  (Id.) Horan stated that he was not receiving adequate mental health treatment and that his sentence was not being honored and requested a transfer to SCI-Mahanoy.  (Id.) On March 14, 2022, he met with Fells and Cyrus, who allegedly informed him that

he had been fired from his food services position based on a negative work report that was written a month after the alleged incident involving Weber. (Id.)

On April 1, 2022, Cyrus purportedly told Horan that his request for a transfer to SCI-Mahanoy was denied because SCI-Camp Hill was now considered part of Region 1, the region in which Horan was allegedly supposed to be housed according to his sentencing order. (Id.) Horan spoke about the denial of the transfer request with Gross on April 18, 2022. (Id.) Horan and Gross additionally spoke about threats Horan had purportedly received from McLothlin. (Id. at 16). On April 21, 2022, McLothlin was paroled from the prison, at which point Horan discovered that Horan had stolen $60 worth of personal property from him. (Id.) Horan spoke with Gross about the theft on April 27, 2022. (Id.) Horan told him that he wished to no longer have a cellmate and that having cellmates caused him anxiety. (Id.) Horan was given another cellmate, Douglas Gettemy, later that day. (Id.)

On May 1, 2022, Horan spoke with Cyrus and Fells about the alleged theft of property by McLothlin. (Id.) Both individuals purportedly told him that he could not prove that the theft occurred. (Id.) On May 6, 2022, McLothlin[3] allegedly threatened Horan in the sallyport of the housing unit. (Id.) On June 2, 2022, Cyrus informed Horan that his request for a vocational transfer to the auto mechanics program was denied because prison officials believed he was being "manipulative." (Id.) On June 15, 2022, Horan met with Behe to discuss his concerns with having a

---

[3] It is not clear from the complaint why McLothlin was there in light of the allegation that he was paroled approximately two weeks before this date.

cellmate. (Id. at 17). Horan purportedly told Behe that he "wish[ed] to be dead" because he could not take the treatment from prison staff any longer. (Id.) Horan allegedly sent a request to Fells for a single cell. (Id.) Later that day, Fells purportedly came to Horan's cell and said that psychiatric staff could not get him a Z-Code. (Id.) Fells then allegedly stated, "You're an inmate. You don't get a choice. I will put whoever the hell I want in with you!" (Id.)

The complaint asserts claims for violation of the First, Eighth, and Fourteenth Amendments and violation of the Pennsylvania Constitution. (Id. at 17-18). It is unclear what specific claims Horan asserts, but we liberally construe seven claims for relief: (1) that Horan's placement in SCI-Camp Hill and the revocation of his Z-Code constituted cruel and unusual punishment in violation of the Eighth Amendment and violated his right to due process under the Fourteenth Amendment; (2) that the lack of mental health care provided to Horan constituted deliberate indifference in violation of the Eighth Amendment; (3) that Gross was deliberately indifferent to the risk that Horan would commit suicide; (4) that the lack of medical care provided to Horan constituted deliberate indifference in violation of the Eighth Amendment; (5) that placement of Horan with cellmates constituted deliberate indifference to the risk that the cellmates would harm Horan; (6) that defendants Butler, Murray, and Jedrzejek retaliated against Horan in violation of the First Amendment; and (7) that defendant Harry is liable for her subordinates' actions under a supervisory liability theory. (See id.) Horan seeks damages and injunctive relief. (Id. at 18).

DOC defendants moved to dismiss the complaint in part on August 3, 2022. (Doc. 4).  Defendant Wanga moved to dismiss on August 25, 2022.  (Doc. 11). Defendants collectively seek dismissal of all claims except Horan's retaliation claim against defendants Butler, Murray, and Jedrzejek for failure to state a claim upon which relief may be granted.  (See Docs. 12, 18).  Wanga additionally argues that the complaint should be dismissed for failure to exhaust administrative remedies.  (Doc. 18 at 4-6).  DOC defendants argue that any claims that survive the motions to dismiss should be severed into separate lawsuits because they are misjoined in violation of Federal Rule of Civil Procedure 20.  (See Doc. 12 at 6 n.2).  Briefing on the motions is complete and they are ripe for review.  (Docs. 12, 18, 20, 23-25).  We consider defendants' arguments below.

## II.   **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents."  Mayer v. Belichick, 605

F.3d 223, 230 (3d Cir. 2010) (citing <u>Pension Benefit Guar. Corp. v. White Consol.</u>
<u>Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the
defendant fair notice of what the . . . claim is and the grounds upon which it rests."
<u>Phillips</u>, 515 F.3d at 232 (alteration in original) (quoting <u>Bell Atl. Corp. v. Twombly</u>,
550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts
a three-step inquiry.  <u>See</u> <u>Santiago v. Warminster Township</u>, 629 F.3d 121, 130-31
(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a
plaintiff must plead to state a claim.'"  <u>Id.</u> at 130 (alteration in original) (quoting
<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a
claim must be separated; well-pleaded facts are accepted as true, while mere legal
conclusions may be disregarded.  <u>Id.</u> at 131-32; <u>see</u> <u>Fowler v. UPMC Shadyside</u>, 578
F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual
allegations, it must determine whether they are sufficient to show a "plausible claim
for relief."  <u>Iqbal</u>, 556 U.S. at 679 (citing <u>Twombly</u>, 550 U.S. at 556); <u>Twombly</u>, 550
U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]
the court to draw the reasonable inference that the defendant is liable for the
misconduct alleged."  <u>Iqbal</u>, 556 U.S. at 678.

Courts must liberally construe complaints brought by *pro se* litigants.  <u>Sause</u>
<u>v. Bauer</u>, 585 U.S. __, 138 S. Ct. 2561, 2563 (2018).  *Pro se* complaints, "however
inartfully pleaded, must be held to less stringent standards than formal pleadings
drafted by lawyers."  <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (quoting <u>Estelle v.</u>
<u>Gamble</u>, 429 U.S. 97, 106 (1976)).

### III.   **Discussion**

### A.      **Horan's Claims**

Horan brings his constitutional claims under 42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

We first address the claim that Horan's placement in SCI-Camp Hill and the revocation of his Z-Code violated his rights under the Eighth and Fourteenth Amendments.  This claim will be dismissed.  Prisoners do not have constitutional rights to placement in a particular prison, Olin v. Wakinekona, 461 U.S. 238, 244-46 (1983), or placement in a single cell.  Rhode v. Chapman, 337, 345-49 (1981); see also Hodges v. Wilson, 341 F. App'x 846, 849 (3d Cir. 2009) (nonprecedential)[4] (holding that revocation of prisoner's Z-Code did not violate constitution because there is no constitutional right to single-cell status).

---

[4] The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  Citations to nonprecedential decisions reflect that the court has carefully considered and is persuaded by the panel's *ratio decidendi*.

The complaint also fails to state a claim upon which relief may be granted to the extent it alleges deliberate indifference to the risk of harm by Horan's cellmates. Claims of deliberate indifference to a risk of harm require plaintiff to show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the defendant was deliberately indifferent to that risk, and (3) the defendant's deliberate indifference caused the plaintiff harm.  Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)), *abrogated in nonrelevant part as recognized by* Mack v. Yost, 968 F.3d 311, 319 n.7 (3d Cir. 2020). The first element is an objective inquiry of whether the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm."  Beers-Capitol v. Wetzel, 256 F.3d 120, 132 (3d Cir. 2001).  The second element is subjective: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  Bistrian, 696 F.3d at 367 (quoting Beers-Capitol, 256 F.3d at 125).

Horan's complaint does not allege that any of his cellmates posed a substantial risk of serious harm to him.  First, the complaint alleges that Bowen stabbed a cellmate before he became Horan's cellmate, but there is no allegation of any risk that Bowen would assault Horan specifically.  By itself the risk that an inmate with a history of violence will attack another inmate for some unknown reason is too speculative to support an Eighth Amendment claim.  See id at 371 ("Thus, according to Bistrian, the risk of the harm that occurred was the risk that an inmate with a history of violence might attack another inmate for an unknown reason.  We cannot conclude on these allegations that prison officials were

deliberately indifferent to such a speculative risk."); see also Blackstone v. Thompson, 568 F. App'x 82, 84 (3d Cir. 2014) ("The risk that an inmate with some history of violence might attack another inmate for an unknown reason, however, is too speculative to give rise to an Eighth Amendment claim."). Moreover, Bowen was removed from Horan's cell after one day, (see Doc. 1-1 at 8), so any risk to Horan's safety that may have been present was ameliorated by Bowen's prompt transfer to another cell.

Second, the complaint alleges that Sarginger had Hepatitis C, but there is no allegation that sharing a cell with Sarginger led to an increased risk that Horan would contract the disease. The fact that Sarginger had the disease is not sufficient to state an Eighth Amendment claim. Cf. Goss v. Sullivan, 839 F. Supp. 1532, 1536-37 (D. Wyo. 1993) (collecting cases for the proposition that prison officials do not violate the Eighth Amendment by housing inmates with cellmates who have tested positive for HIV or AIDS); Feigley v. Fulcomer, 720 F. Supp. 475, 482 (M.D. Pa. 1989) (concluding that prison officials did not violate the Eighth Amendment by failing to segregate inmates who tested positive for HIV or AIDS from other inmates).

Third, the allegation that McLelland had recently been quarantined for a suspected COVID-19 infection prior to moving into Horan's cell is not sufficient to state an Eighth Amendment claim. It is not alleged that McLelland was actually infected with COVID-19 at the time he was moved into the cell or that prison officials were aware of such an infection. To the contrary, the complaint alleges that Horan and McLelland tested positive for COVID-19 on the same day, February 26, 2021, sixteen days after McLelland was moved into the cell. (See Doc. 1-1 at 9).

The allegation that McLelland tested positive for COVID-19 while sharing a cell with Horan is not by itself sufficient to allege deliberate indifference. See, e.g., Zuber v. Sorber, No. 22-CV-3661, 2023 WL 144437, at *4 (E.D. Pa. Jan. 9, 2023) (concluding that plaintiff's allegation that his cellmate had COVID-19 was not sufficient to allege that prison officials were deliberately indifferent to plaintiff's health and safety).

Fourth, Horan's vague allegations of "threats" by McLelland and McLothlin, (see Doc. 1-1 at 9-10, 16), are not sufficient to support a deliberate indifference claim. Horan does not allege the specific threats made by McLelland or McLothlin, the context in which the threats were made, any supporting facts that would indicate the threats were credible, or any supporting facts that would indicate that the threats put Horan in substantial risk of serious harm. Absent such supporting allegations, his conclusory assertions that he was threatened by McLelland and McLothlin are not sufficient to state a deliberate indifference claim upon which relief may be granted.

Fifth, Horan's allegation that McLothlin stole $60 of personal property from him also cannot support a deliberate indifference claim. Deliberate indifference to theft of an inmate's personal property by other inmates does not violate the Eighth Amendment. See, e.g., Hunter v. Sherman, 49 F. App'x 611, 612 (6th Cir. 2002); Wa-Gino v. Ariz. Dep't of Corrs., 94 F.3d 654 (9th Cir. 1996); Brown v. Dep't of Pub. Safety & Corr. Servs., 383 F. Supp. 3d 519, 548 (D. Md. 2019).

Finally, the complaint does not allege any facts with respect to cellmates Ricketts, Hake, Cook, or Gettemy beyond the fact that they were Horan's cellmates

and that he had unspecified "problems" with Cook. (See Doc. 1-1 at 8, 10, 13, 16). Hence, because the complaint fails to allege that any of Horan's cellmates posed a substantial risk of serious harm to him, we will dismiss the complaint to the extent it asserts a claim for deliberate indifference to the risk of harm by cellmates.

Horan's claims arising from purportedly inadequate mental health care and medical care are governed by the deliberate indifference to a serious medical need standard. Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 763 (3d Cir. 1979). To state a claim for deliberate indifference, a plaintiff must allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." Id. (citation omitted). A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Negligence by defendants is not sufficient to establish deliberate indifference to a serious medical need.  Id. at 835.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  Palakovic v. Wetzel, 854 F.3d 209, 228 (3d Cir. 2017) (quoting United States ex rel. Walker v. Fayette County, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  It is not appropriate for courts to second-guess the "propriety or adequacy of a particular course of treatment;" such decisions remain questions "of sound professional judgment" that are not considered deliberate indifference.  Id. (quoting Pierce, 612 F.2d at 762).

Based on his own factual allegations in the operative complaint, Horan does not assert a plausible deliberate indifference claim for failure to provide medical care.  The complaint reflects that defendants diligently treated all his symptoms and sought to diagnose causes for the symptoms.  According to the complaint, medical professionals employed in the prison provided treatment for Horan's symptoms on April 26, 2021, June 21, 2021, July 6, 2021, July 14, 2021, July 27, 2021, August 17, 2021, September 7, 2021, September 21, 2021, September 27, 2021, October 4, 2021, October 6, 2021, October 18, 2021, October 28, 2021, December 6, 2021, January 3, 2022, January 14, 2022, and March 3, 2022.  (Doc. 1-1 at 10-15). Medical personnel also prescribed Horan several medications to treat his symptoms, including Celebrex, Prednisone, Doxycycline, and Mobic; assigned him bottom bunk status; ordered him to receive a new mattress; vaccinated him against COVID-19; sent him to appointments with an outside rheumatologist on two

separate occasions; gave him excused absences from his job for more than a month; and diagnosed rheumatoid arthritis, Lyme disease, and COVID-19 as likely causes for his symptoms.  (Id. at 10-13).  Horan may disagree with defendants' decisions or believe that he should be receiving more care than he is receiving, but that is not sufficient for the deliberate indifference claim to proceed.  See Palakovic, 854 F.3d at 228 (noting that disagreement as to the adequacy of treatment provided to plaintiff is not sufficient to establish deliberate indifference).

The complaint does, however, state a claim for deliberate indifference based on the purportedly insufficient mental health care provided to Horan.  Horan's suicidal ideations and attempted suicide are sufficient to allege a serious medical need.  See id. at 222-23 (noting that past suicide attempts may establish plaintiff's particular vulnerability to suicide and serious medical need for mental health treatment).  Although the complaint shows that mental health professionals[5] met with Horan to discuss his mental health on numerous occasions between April 2020 and June 2022, Horan alleges that these meetings were little more than *pro forma* interactions conducted at the side of his cell, often within earshot of his cellmate. (See Doc. 1-1 at 6-17).  We find this sufficient to allege deliberate indifference to Horan's serious medical need for mental health care.  See Sides v. Wetzel, No. 2:20-

---

[5] Defendant Cyrus was a party to several of these meetings, and we construe the complaint to fairly allege that Cyrus was acting as a mental health professional during said meetings.  (See Doc. 1-1 at 7).  Defendants dispute the contention that Cyrus is a mental health professional.  (See Doc. 12 at 14).  But we must accept plaintiff's allegations of fact as true for purposes of resolving the motions to dismiss. See Santiago, 629 F.3d at  131-32.

CV-1168, 2021 WL 8017811 (W.D. Pa. Nov. 21, 2021), *report and recommendation adopted*, Sides v. Wetzel, No. 2:20-CV-1168, 2022 WL 1091915, at *1 (W.D. Pa. Apr. 12, 2022) (finding allegation that prison officials conducted only short visits at cell door sufficient to allege deliberate indifference to serious medical need in light of plaintiff having suicidal and homicidal thoughts, hearing voices in his head, and attempting suicide).[6]

The complaint also states a claim against Gross for deliberate indifference to the risk that Horan would commit suicide. To establish deliberate indifference to risk of suicide, plaintiff must show (1) that he had a particular vulnerability to

---

[6] Horan argues that Sides and Dooley v. Wetzel, 957 F.3d 366 (3d Cir. 2020), entitle him to more mental health treatment than he is currently receiving because: (1) he has been diagnosed with a serious mental illness and (2) he entered a plea of GBMI. (See Doc. 20 at 11-12; Doc. 25 at 8). Horan misapprehends the holdings of Dooley and Sides.

In Dooley, the plaintiff alleged that because he pleaded GBMI in his underlying criminal trial he was entitled to greater mental health care. Dooley, 957 F.3d at 370. The district court dismissed the complaint without leave to amend as frivolous, but the court of appeals affirmed in part and vacated in part, holding that the complaint failed to state a claim, but that amendment could cure the complaint's defects. Id. at 373-76. Dooley thus stands for the well-established proposition that the district court should permit leave to amend before dismissing a civil rights claim for failure to state a claim upon which relief may be granted; it does not establish a constitutional minimum amount of mental health care that must be provided to inmates.

In Sides, the plaintiff alleged that short visits from a prison psychologist at his cell door were constitutionally inadequate and the court denied the defendant's motion to dismiss for failure to state a claim upon which relief may be granted. Sides, 2021 WL 8017811, at *2, 10-11. Sides does not establish a *per se* rule requiring prison officials to provide a certain level of mental health care for inmates who have been diagnosed as mentally ill; it simply finds that the plaintiff's allegations were sufficient to state a deliberate indifference claim upon which relief could be granted.

suicide, meaning that there was a strong likelihood he would attempt suicide rather than a mere possibility; (2) that defendant knew or should have known of plaintiff's particular vulnerability to suicide; and (3) that defendant acted with reckless or deliberate indifference to plaintiff's vulnerability to suicide.  Palakovic, 854 F.3d at 223-24.  Knowledge of a plaintiff's particular vulnerability to suicide may be shown by, for example, evidence that defendant knew that plaintiff had a history of suicide attempts.  Id. at 222-23.  Horan alleges that he told Gross he had "taken a whole bottle of pills and slit [his] wrists," that he showed Gross the wounds he suffered, and that Gross did nothing in response.  (Doc. 1-1 at 7).  We find this sufficient to allege that Gross was aware of Horan's particular vulnerability to suicide based on a past suicide attempt and that Gross was deliberately indifferent to the particular vulnerability.  See Palakovic, 854 F.3d at 222-24.

Horan's claims against defendants Harry and Fells will be dismissed, as Horan has failed to allege their personal involvement.  A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation.  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018).  The defendant's personal involvement cannot be based solely on a theory of respondeat superior.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence.  Id.  A defendant's review and denial of a prisoner's grievance is not sufficient to establish the defendant's personal involvement in an underlying violation of the prisoner's constitutional rights.  Dooley, 957 F.3d at 374.  The complaint does not allege that

Harry was personally involved in any of the alleged violations of Horan's civil rights. Rather, it appears that Horan's claims against Harry are based solely on her role as superintendent and her denial of Horan's grievances, neither of which is sufficient to allege personal involvement.  See id.; Rode, 845 F.2d at 1207.  Similarly, the only allegation of Fells's personal involvement is that she attended a meeting on March 10, 2022 with Horan and mental health professionals who were involved in his treatment.  (See Doc. 1-1 at 15).  It is not alleged that Fells provided mental health treatment to Horan or that she directed the other defendants to provide deficient mental health treatment to Horan.  Hence, we will dismiss the claims against Harry and Fells for lack of personal involvement.

Finally, we will dismiss Horan's claims for violations of the Pennsylvania Constitution.  Pennsylvania law does not recognize a cause of action allowing a plaintiff to recover money damages for violation of the Pennsylvania Constitution. Mt. Airy #1, LLC v. Pa. Dep't of Revenue and Elieen McNulty, 154 A.3d 268, 280 n.11 (Pa. 2016).

### B.    Exhaustion of Administrative Remedies

Defendant Wanga argues that all claims against him should be dismissed for failure to exhaust administrative remedies.  (Doc. 18 at 4-6).  Wanga represents that Horan has only filed one grievance that pertain to his claims against Wanga and that he did not complete the prison's administrative appeal process with respect to this grievance.  (Id. at 5).  Horan responds that the prison did not comply with its own rules for timely returning his grievance to him and that contrary to Wanga's

assertion, Horan filed nine additional grievances that implicate Wanga.  (Doc. 25 at 4-5).  Wanga has not responded to Horan's argument.

Under the Prison Litigation Reform Act ("PLRA"), prisoners complaining about the conditions of their confinement must exhaust available administrative remedies before they may file suit in federal court.  42 U.S.C. § 1997e(a).  The PLRA requires proper exhaustion, meaning plaintiffs must administratively grieve their claims in accordance with the procedural rules of the prison in which they are incarcerated.  Downey v. Pa. Dep't of Corr., 968 F.3d 299, 305 (3d Cir. 2020) (citing Woodford v. Ngo, 548 U.S. 81, 88 (2006)).  Failure to exhaust administrative remedies is an affirmative defense that defendants must plead and prove; it is not a pleading requirement for plaintiffs.  Jones v. Bock, 549 U.S. 199, 216 (2007).  The defense may be raised in a motion to dismiss.  Brown v. Croak, 312 F.3d 109 (3d Cir. 2002).

We find that defendant Wanga has not met his burden to establish that Horan's complaint should be dismissed for failure to exhaust administrative remedies.  Wanga represents that Horan only brought one grievance against him and that he failed to exhaust that grievance, (doc. 18 at 4-6), while Horan represents that the grievance process was unavailable to him and that he filed nine additional grievances against Wanga that Wanga failed to mention.  (Doc. 25 at 4-5).  Hence, there are questions of fact as to whether Horan exhausted administrative remedies that cannot be resolved at this stage of litigation.

### C.      Leave to Amend

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile.  <u>Phillips</u>, 515 F.3d at 245.  We find that amendment would be futile to the extent Horan alleges that his placement in SCI-Camp Hill or the revocation of his Z-Code violated his constitutional rights because those claims fail as a matter of law.  For the same reason, we find that amendment would be futile as to Horan's claims that defendants violated the Pennsylvania Constitution.  But we will grant leave to amend as to the other dismissed claims because those claims are factually, rather than legally, deficient.

### D.      Joinder

DOC defendants argue that because some claims have been allowed to proceed or have been dismissed without prejudice, the claims should be severed into separate lawsuits because they are misjoined in violation of Federal Rule of Civil Procedure 20.  (Doc. 12 at 6 n.2).  Under Rule 20, claims against multiple defendants may be joined in the same action only if:

> **(A)** any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> **(B)** any question of law or fact common to all defendants will arise in the action.

<u>See</u> Fed. R. Civ. P. 20(a)(2).  The decision of whether to sever misjoined claims is left to the discretion of the district court, <u>DirecTV, Inc. v. Leto</u>, 467 F.3d 842, 844 (3d Cir. 2006), and claims may be severed "at any time."  FED. R. CIV. P. 21.  In deciding

whether severance is appropriate, the court may consider, *inter alia*, "promotion of the expeditious resolution of the litigation." <u>Russell v. Chesapeake Appalachia, L.L.C.</u>, 305 F.R.D. 78, 81 (M.D. Pa. 2015).

The court will decline to sever Horan's claims at this time. In light of the court's analysis of the merits of defendants' motions to dismiss, the case is currently proceeding only as to plaintiff's retaliation claim, his deliberate indifference claim arising from allegedly deficient mental health treatment, and his deliberate indifference to risk of suicide claim. Given the uncertainty as to whether plaintiff will amend his complaint and whether the pleading defects identified by the court will be remedied by amendment, the court finds that denial of the request to sever is appropriate at this time to promote the expeditious resolution of the litigation. <u>See</u> <u>Russell</u>, 305 F.R.D. at 81. If future proceedings demonstrate the necessity of severance, the court will sever plaintiff's claims as necessary.

**IV.**   <u>**Conclusion**</u>

We will grant in part and deny in part DOC defendants' motion to dismiss (Doc. 4), deny defendant Wanga's motion to dismiss (Doc. 11), and grant plaintiff leave to amend. An appropriate order shall issue.

<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    February 7, 2023