## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK HORAN, | : | CIVIL ACTION NO. 1:22-CV-1166 |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| THADDEUS GROSS, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983.  Plaintiff, Patrick Horan, alleges violations of his civil rights arising from prison officials' purported denial of mental health care, deliberate indifference to Horan's medical needs, and retaliation by prison officials for his filing of grievances and complaints. The case is proceeding on Horan's amended complaint.  Defendants Gross, Cyrus, Falls, Harry, Jedrzejek, Murray, and Butler ("DOC defendants") have moved to strike portions of the amended complaint and have moved to dismiss the amended complaint in part, and Horan has moved to strike the affirmative defenses advanced by defendant Wanga.  The motion to dismiss will be granted in part, Horan's motion to strike will be granted, and DOC defendants' motion to strike will be granted in part and denied in part.

## I.   <u>Factual Background & Procedural History</u>

Horan filed this case in the Cumberland County Court of Common Pleas on June 23, 2022.  (Doc. 1-1).  Horan's original complaint asserted seven claims for relief: (1) that Horan's placement in SCI-Camp Hill and the revocation of his Z-Code

constituted cruel and unusual punishment in violation of the Eighth Amendment and violated his right to due process under the Fourteenth Amendment; (2) that the lack of mental health care provided to Horan constituted deliberate indifference in violation of the Eighth Amendment; (3) that defendant Gross was deliberately indifferent to the risk that Horan would commit suicide; (4) that the lack of medical care provided to Horan constituted deliberate indifference in violation of the Eighth Amendment; (5) that placement of Horan with cellmates constituted deliberate indifference to the risk that the cellmates would harm Horan; (6) that defendants Butler, Murray, and Jedrzejek retaliated against Horan in violation of the First Amendment; and (7) that defendant Harry was liable for her subordinates' actions under a supervisory liability theory.  (See id.)

Defendants removed the case to this district on July 27, 2022.  (Doc. 1). Following removal, DOC defendants moved to dismiss Horan's complaint in part on August 3, 2022, and defendant Wanga moved to dismiss the complaint on August 25, 2022.  (Docs. 4, 11).  Collectively, the motions sought to dismiss all claims other than Horan's retaliation claim against Butler, Murray, and Jedrzejek.

The court resolved the motions to dismiss on February 7, 2023.  (Docs. 27-28). The court dismissed with prejudice Horan's claims arising from his placement in SCI-Camp Hill and defendants' refusal to grant him single-cell status, noting that prisoners do not have a constitutional right to placement in a particular prison or placement in a single cell.  (Doc. 27 at 16).  The court dismissed without prejudice Horan's claim that defendants were deliberately indifferent to a risk of harm from his cellmates and his claim that defendants were providing inadequate medical care

to him, finding that the complaint failed to state plausible claims for relief with respect to either claim. (Doc. 27 at 17-21). The court denied the motions to dismiss to the extent they sought dismissal of Horan's claims of insufficient mental health care and deliberate indifference to a risk of suicide. (Id. at 22-23). The court additionally dismissed all claims against defendants Harry and Fells for failure to allege personal involvement and dismissed all claims of violation of the Pennsylvania Constitution because Pennsylvania does not recognize a cause of action for damages for the violation of a plaintiff's rights under the Pennsylvania Constitution. (Id. at 24-25). The court granted Horan leave to amend his complaint with respect to all claims other than the claims arising from his placement in SCI-Camp Hill and the denial of a single cell. (Id. at 27). Finally, the court denied DOC defendants' request to sever Horan's remaining claims into separate lawsuits without prejudice and noted that "[i]f future proceedings demonstrate the necessity of severance, the court will sever plaintiff's claims as necessary." (Id. at 28).

Horan filed an amended complaint on March 7, 2023. (Doc. 32). According to the amended complaint, Horan was transferred to SCI-Camp Hill in March 2020 following the closure of SCI-Retreat. (Doc. 32 at 2). He was housed in SCI-Retreat's residential treatment unit, but was assigned to general population upon his arrival at SCI-Camp Hill. (Id.) Horan was purportedly given a "Z-Code"—a housing classification that allowed him to not have a cellmate—while he was in SCI-Retreat. (Id. at 4). Upon his transfer to SCI-Camp Hill, Horan's Z-Code was revoked. (Id.)

On April 1, 2020, Horan met with defendant Gross, a psychologist employed by the prison, and explained that his sentencing order required assignment to a

secure mental health facility with constant psychiatric care because he pled guilty but mentally ill ("GBMI").  (Id. at 4).  Horan filed a transfer request.  (Id.) Defendant Cyrus, a counselor in SCI-Camp Hill, purportedly stated he could not be transferred until he had been housed there for two years.  (Id.)

On July 16, 2020, Horan met with his assigned psychological review team and purportedly reiterated that his sentencing order required him to be housed in a secure mental health facility.  (Id.)  On July 28, 2020, Horan met with Gross at his cell door.  (Id.)  Cyrus purportedly interrupted this meeting to inform Horan that his Z-Code had been revoked.  (Id.)  Horan filed a grievance on August 2, 2020, complaining that his Z-Code was revoked despite no staff member assessing how this would affect his mental health.  (Id.)  Prison staff allegedly denied the grievance based on Horan's failure to inform staff of his mental health status.  (Id.)  Horan met with Gross on August 11, 2020, to discuss the denial and told him he had "taken a whole bottle of pills and slit [his] wrists."  (Id.)  According to the amended complaint, Horan showed Gross his self-inflicted wounds.  (Id.)  Gross purportedly did nothing in response.  (Id.)

Horan met with Cyrus on September 8, 2020 and with Gross on October 6, 2020 to discuss his mental health.  (Id. at 5).  On October 21, 2020, he met with Gross to discuss the constant headaches he was experiencing and his difficulty breathing while exercising.  (Id.)  On October 28, 2020, he met with non-party psychologist Ms. Bowser for an evaluation.  (Id.)  Horan told Bowser about his request to have his Z-Code reinstated, but Bowser purportedly told him that an inmate's mental health was no longer considered in deciding whether to grant a prisoner a Z-Code and that

Z-Codes were instead exclusively based on an inmate's risk of violence.  (Id.)  On November 5, 2020, he met with Gross and Bowser to discuss his alleged lack of mental health treatment, his housing concerns, and his headaches and respiratory problems.  (Id.)  On January 4, 2021, he met with Gross to discuss his health concerns.  (Id. at 6).

The amended complaint alleges that Horan has had several cellmates since the removal of his Z-Code.  On November 12, 2020, an inmate named Tyrell Bowens moved into his cell.  (Id. at 5).  Bowens had previously been confined in the prison's Behavioral Modification Unit after purportedly stabbing his cellmate.  (Id.)  Horan and Bowens met with prison staff the following day to state they were not compatible as cellmates.  (Id.)  Bowens was transferred out of the cell.  (Id.)  Horan was subsequently given Matthew Ricketts as a cellmate until January 19, 2021.  (Id. at 6).  Prison staff allegedly transferred Ricketts out of the cell in response to Ricketts's grievance—which Horan supposedly helped prepare—regarding the prison's refusal to place him in a sex offender program.  (Id.)  On January 20, 2021, Kyle Sarginger was moved into Horan's cell, which purportedly posed a "direct threat to [Horan'a] physical and mental health."[1]  (Id.)  Horan and Sarginger allegedly remained cellmates until February 9, 2021, when Sarginger was moved out of the cell.  (Id.)  Jeff McLelland, who had recently been housed in the infirmary

---

[1] The amended complaint does not state why Sarginger posed a threat to Horan's health, but the court takes judicial notice that Horan's original complaint alleged that Sarginger posed a threat to Horan's health because he suffers from Hepatitis C.  (See Doc. 1-1 at 8).

with a suspected COVID-19 infection, was transferred to the cell the same day.  (Id.)
Horan and McLelland immediately got into an argument about McLelland smoking
e-cigarettes in the cell.  (Id.)

Horan purportedly met with Gross on February 10, 2021, to discuss concerns
that prison staff were putting him in danger by giving him cellmates without
assessing their compatibility.  (Id.)  On February 25, 2021, approximately 90 inmates
were removed from Horan's housing block after testing positive for COVID-19.  (Id.)
McLelland was exhibiting symptoms of COVID-19 at the time, but did not test
positive for the virus.  (Id.)  The next day, both Horan and McLelland allegedly
became sick with COVID-19.  (Id. at 6-7).

On March 1, 2021, Horan met with defendant Gross about threats made by
McLelland in which McLelland purportedly told Horan, "I'm going to f*** you up,
old man."  (Id. at 7 (alteration in original)).  On March 2, 2021, Horan met with
defendant Wanga, a psychiatrist in the prison, about the threats by McLelland and
Horan's continuing concern that he was supposed to be housed in a secure mental
health facility.  (Id.)  On March 18, 2021, Horan met with a psychological review
team comprised of Gross, Wanga, and a nurse in the prison about the threats by
McLelland.  (Id.)  On March 24, 2021, McLelland allegedly threatened Horan in an
unspecified manner.  (Id.)  Horan reported the threat to Sgt. Boone, who arranged
to have McLelland transferred out of Horan's cell.  (Id.)  Gross allegedly
acknowledged on March 25, 2021, that he "dropped the ball" with respect to the
threats made by McLelland.  (Id.)  On March 29, 2021, an inmate named Corey
Clingerman was moved into Horan's cell.  (Id. at 7-8).

On April 16, 2021, Horan received an initial review response to a grievance he filed regarding McLelland's purported threats.  (Id. at 8).   The response stated that Horan had never informed Gross of the threats made by McLelland.  (Id.)  Horan spoke with Gross, who allegedly confirmed that Horan had informed him about the threats on March 1, 2021 and March 18, 2021.  (Id.)

On April 26, 2021, Horan told an unnamed nurse he was experiencing chest pain resulting from COVID-19.  (Id.)  On June 21, 2021, Horan met with a physician's assistant named Karen to discuss "relentless body pain" and respiratory problems that Horan attributed to COVID-19.  (Id.)  Karen prescribed him Celebrex to treat the symptoms.  (Id.)  On June 30, 2021, Horan met with Cyrus for an annual review.  (Id.)  Cyrus purportedly spoke "abusively" towards Horan because Horan would not sign paperwork confirming that he refused a work assignment.  (Id.)

On July 6, 2021, Horan met with a physician's assistant named Amy, who prescribed him Prednisone and said that Horan's arthritis pain could be attributed to his chronic Lyme disease that was exacerbated by COVID-19.  (Id.)  On July 8, 2021, Horan met with Wanga, Gross, and four other prison employees to discuss his mental health, his requested transfer, and his problems with Cyrus.  (Id.)  On July 14, 2021, Horan met with a physician's assistant named Justin to discuss severe headaches, hand numbness, muscle cramps, and pain he was experiencing.  (Id.)  On July 19, 2021, Horan met with Gross to discuss his problems with Cyrus and the medical issues he ascribed to COVID-19.  (Id.)  On July 27, 2021, Horan again met with physician's assistant Amy and told her he was experiencing severe pain, shakes, and difficulty conducting normal movements or functions.  (Id. at 9).  Amy

prescribed him Prednisone and Doxycycline and informed him that he was scheduled to see a doctor.  (Id.)

On August 3, 2021, Horan was given a new cellmate named Greg Hake.  (Id.) The next day, Counselor Misiti allegedly told Horan that if he did not consent to be vaccinated against COVID-19 he would be moved to I-Block and isolated and his pay for employment would be reduced from $2.52 per day to $0.72 per day.  (Id.) Horan met with physician's assistant Karen on August 5, 2021, who prescribed him bottom bunk status allegedly as the result of being "crippled from COVID exposure."  (Id.)  On the same day, Horan was purportedly compelled to be vaccinated against COVID-19 despite his objections to the vaccine and his statement that he had underlying immune deficiencies due to chronic Lyme disease.  (Id.)

On August 11, 2021, Horan met with Wanga to discuss his mental health progress, the stress he was experiencing due to alleged lack of mental health treatment at SCI-Camp Hill, and the worsening of his mental health due to his housing situation.  (Id.)  On August 17, 2021, Horan met with Dr. Voorstad to discuss his ongoing concerns with Lyme disease and COVID-19.  (Id.)  Horan told Dr. Voorstad that he was experiencing pain in his hips, neck, shoulders, and hands and that he was having difficulty functioning.  (Id.)  Voorstad submitted a request for Horan to be seen by a rheumatologist.  (Id.)

On August 24, 2021, Horan met with Gross to discuss his stress, his medical issues, and the problems he was experiencing with Cyrus.  (Id. at 10).  On September 4, 2021, Horan took the day off from work because he was in extreme

pain, but the medical department allegedly refused to see him. (Id.) Horan then received medical treatment "at least 15 more times" between September 7, 2021 and May 6, 2022.[2] (Id.)

On October 19, 2021, Horan met with Gross and told him that his constant pain was having a negative effect on his mental health and exacerbating his depression. (Id.) On October 27, 2021, Horan spoke with defendant Murray about the medical issues that were making it difficult to work. (Id.) Murray allegedly told him he needed to "get something from Medical" in order to not come to work or risk being cited for misconduct. (Id.) Prison staff subsequently placed Horan on medical lay-in until December 3, 2021. (Id.)

On November 12, 2021, Horan met with Gross, Cyrus, and "Nurse."[3] (Id.) He complained about the purported lack of mental health treatment at SCI-Camp Hill, his need for a transfer to another prison, and the medical issues and pain he was experiencing. (Id.)

On January 3, 2022, defendant Butler escorted Horan out of the prison's butcher shop where he was employed and told him that he was no longer employed there. (Id.) Horan asked why, and Butler allegedly stated, "I don't have to give you a reason." (Id.) The same day, Horan's former coworker in the butcher shop,

---

[2] It appears that Horan has deleted many of the allegations from these medical visits from his amended complaint, but the court takes judicial notice that the original complaint described the treatment he received during the visits in significant detail. (See Doc. 1-1 at 10, 12-13, 15).

[3] It is unclear from the amended complaint whether this is a reference to an individual named "Nurse" or an unnamed nurse, but we assume the latter.

Anthony Forsythe, purportedly told him that Butler did not want Horan working there because Horan had filed a grievance against him. (Id.)

On January 4, 2022, Horan spoke with Butler's supervisor, Davis, who told Butler to reinstate Horan to his job in the butcher shop. (Id. at 11). Butler allegedly told Horan he "better not" file any more grievances against him. (Id.) On January 10, 2022, Horan filed a grievance alleging that his pay was $77.26 short. (Id.) On January 13, 2022, Horan agreed to drop his grievance after defendant Jedrzejek stated Horan would get back pay and that Butler would be reprimanded. (Id.)

On January 26, 2022, Butler purportedly threatened to fire Horan and said "some people are lucky they are in prison" while pointing his finger at Horan and pretending to shoot him in the face. (Id. at 11). Butler also purportedly said that he knew Horan had sent a letter to the prison's Prison Rape Elimination Act ("PREA") coordinator regarding alleged misconduct by Butler. (Id.) Horan filed a grievance against Butler for this incident on January 28, 2022, but the grievance was denied. (Id.)

On January 31, 2022, Horan filed an incident report against Butler. (Id.) Ten minutes later, Butler allegedly fired him from the butcher shop. (Id.) Horan filed a grievance about the firing, which was denied. (Id.) Horan wrote a letter to the PREA coordinator on February 3, 2022, complaining that he was being retaliated against and told Gross about the alleged retaliation on February 10, 2022. (Id.)

On February 14, 2022, Horan was allegedly removed from his food service job in the prison. (Id. at 12). Sgt. Myers purportedly told Horan that he would be cited for misconduct for threatening another inmate named Richard Weber, despite

10

Horan's unit manager allegedly confirming that Horan had not threatened Weber. (<u>Id.</u>) Horan was moved to a different housing block after this interaction. (<u>Id.</u>) Horan grieved his removal from the food service position on February 18, 2022. (<u>Id.</u>) On February 22, 2022, Horan met with Unit Manager Fells, who allegedly stated there were no grounds for Horan to be dismissed from his position. (<u>Id.</u>)

On February 25, 2022, Gross came to Horan's cell. (<u>Id.</u>) Horan told him he had been trying to see him for ten days since he was moved. (<u>Id.</u>) Gross allegedly stated that he was not aware that Horan had been moved and that it was "ridiculous" no one had checked on him given his status as an inmate who pleaded GBMI. (<u>Id.</u>) Horan told Gross he was not comfortable having a cellmate. (<u>Id.</u>)

On March 7, 2022, Horan met with Nurse Behe for a psychological evaluation. (<u>Id.</u> at 12). Horan told her that SCI-Camp Hill was not meeting his treatment needs because he was not housed in a secure mental health facility under constant psychiatric care. (<u>Id.</u>) Horan told her about his lack of sleep and anxiety and stated he did not want to have a cellmate and that he wished to be transferred. (<u>Id.</u>) Behe allegedly stated that she would put in a request for Horan to have a psychiatric referral. (<u>Id.</u>) Later that day, Horan was given a new cellmate, defendant Paul McLothlin. (<u>Id.</u>)

On March 10, 2022, Horan met with Wanga, Fells, Cyrus, and "Nurse." (<u>Id.</u>) Horan stated that he was not receiving adequate mental health treatment and that his sentence was not being honored and requested a transfer to SCI-Mahanoy. (<u>Id.</u>) On March 14, 2022, he met with Fells and Cyrus, who allegedly informed him that

he had been fired from his food services position based on a negative work report that was written a month after the alleged incident involving Weber.  (Id. at 13).

On April 1, 2022, Cyrus purportedly told Horan that his request for a transfer to SCI-Mahanoy was denied because SCI-Camp Hill was now considered part of Region 1, Horan's required region according to his sentencing order.  (Id.)  Horan spoke about the denial of the transfer request with Gross on April 18, 2022.  (Id.)  Horan and Gross additionally spoke about threats Horan had purportedly received from McLothlin.  (Id.)  On April 21, 2022, McLothlin transferred from Horan's cell, whereupon Horan allegedly discovered that McLothlin had stolen $60 worth of his personal property.  (Id.)  Horan spoke with Gross about the theft on April 27, 2022, and advised him that he could not tolerate another cellmate because they caused him significant anxiety.  (Id. at 14).  Despite these entreaties, he was given another cellmate, Douglas Gettemy, later that day.  (Id.)

On May 1, 2022, Horan spoke with defendant Fells about the alleged theft of property by McLothlin.  (Id.)  Fells purportedly told him that he could not prove the theft occurred.  (Id.)  On May 6, 2022, McLothlin allegedly threatened Horan in the sallyport of the housing unit, stating that he was going to "f*** [him] up."  (Id. (spelling alteration in original)).  Horan reported the threat to Gross a few minutes after it occurred, but Gross purportedly stated that because McLothlin had not assaulted Horan that he was not going to do anything about the threat.  (Id.)

On June 2, 2022, Cyrus informed Horan that his request for a vocational transfer to the auto mechanics program was denied because prison officials believed he was being "manipulative."  (Id.)  On June 15, 2022, Horan met with

Behe to discuss his concerns with having a cellmate.  (<u>Id.</u> at 15).  Horan purportedly told Behe that he "wish[ed] to be dead" because he could not take the treatment from prison staff any longer.  (<u>Id.</u>)  Cyrus allegedly sent a recommendation to Fells for Horan to be given a single cell.  (<u>Id.</u>)  Later that day, Fells purportedly came to Horan's cell and said that psychiatric staff could not get him a Z-Code.  (<u>Id.</u>)  Fells then allegedly stated, "You're an inmate.  You don't get a choice.  I will put whoever the hell I want in with you!"  (<u>Id.</u>)  On July 8, 2022, prison staff purportedly suspended Horan's phone access in retaliation for Horan filing a complaint against them.  (<u>Id.</u>)

The court liberally construes the amended complaint as asserting the following claims for relief: (1) that Horan's placement in SCI-Camp Hill coupled with the denial of a single cell violate his rights under the First, Eighth, and Fourteenth Amendments; (2) that the lack of mental health care provided to Horan constitutes deliberate indifference in violation of the Eighth Amendment; (3) that defendant Gross was deliberately indifferent to the risk that Horan would commit suicide; (4) that the lack of medical care provided to Horan constitutes deliberate indifference in violation of the Eighth Amendment; (5) that placement of Horan with cellmates constitutes deliberate indifference to the risk that the cellmates would harm Horan; (6) that defendants Butler, Murray, and Jedrzejek retaliated against Horan in violation of the First Amendment; (7) that defendant Harry is liable for her subordinates' actions under a supervisory liability theory; (8) that defendants Fells, Dickey, and Cline retaliated against Horan in violation of the First Amendment in a separate incident that occurred after the filing of this case; and (9)

that defendant McLothlin violated Horan's rights under the Fourth Amendment by stealing his property.  (See id. at 16-17).  Horan seeks nominal, compensatory, and punitive damages.  (Id.)

DOC defendants filed a motion to strike portions of the amended complaint on March 31, 2023.  (Doc. 35).  DOC defendants seek to strike (1) Horan's claims and related averments arising from his placement in SCI-Camp Hill and denial of a single cell because those claims were previously dismissed with prejudice; (2) Horan's claims and related averments asserting that defendants retaliated against him after the filing of this case because Horan did not seek leave to supplement his complaint prior to adding these claims; and (3) Horan's claim against defendant McLothlin because McLothlin was not acting under color of state law.  (Docs. 35, 39).  DOC defendants have additionally moved to dismiss all of Horan's claims except his retaliation claim against Butler, Murray, and Jedrzejek and his deliberate indifference to risk of suicide claim against Gross.  (See Docs. 36, 40).  Defendant Wanga has not moved to dismiss the amended complaint and has filed an answer and affirmative defenses.  (Doc. 34).  Horan has filed a motion to strike Wanga's affirmative defenses.  (Doc. 38).  Briefing on the motion to dismiss and motions to strike is complete and all three motions are ripe for the court's review.  (See Docs. 39-42, 45).

## II.   **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the

court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

15

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]
the court to draw the reasonable inference that the defendant is liable for the
misconduct alleged."  Iqbal, 556 U.S. at 678.

Courts must liberally construe complaints brought by *pro se* litigants.  Sause
v. Bauer, 585 U.S. __, 138 S. Ct. 2561, 2563 (2018).  *Pro se* complaints, "however
inartfully pleaded, must be held to less stringent standards than formal pleadings
drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v.
Gamble, 429 U.S. 97, 106 (1976)).

**III.**   **Discussion**

Horan brings his constitutional claims under 42 U.S.C. § 1983.  Section 1983
creates a private cause of action to redress constitutional wrongs committed by
state officials.  42 U.S.C. § 1983.  The statute is not a source of substantive rights, but
serves as a mechanism for vindicating rights otherwise protected by federal law.
See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d
1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, plaintiffs must show a
deprivation of a "right secured by the Constitution and the laws of the United
States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204
(quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

**A.**   **Motions to Strike**

The court will first consider the parties' motions to strike.  Under Federal
Rule of Civil Procedure 12(f), the court may strike from a pleading "any redundant,
immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).  District
courts have "considerable discretion" in resolving a Rule 12(f) motion.  Krisa v.

16

Equitable Life Assurance Soc'y, 109 F. Supp. 2d 316, 319 (M.D. Pa. 2000) (quoting N. Penn. Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 158 (E.D. Pa. 1994)). In general, such a motion will be denied unless the allegations are severely prejudicial to one of the parties and unrelated to the plaintiff's claims.  Id.; see also 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1382 (3d ed. 2016).  A party is prejudiced when the challenged pleading "confuses the issues" or places an undue burden on the responding party.  Karpov v. Karpov, 307 F.R.D. 345, 348 (D. Del. 2015).  "Motions to strike are generally disfavored and rarely granted."  U.S. Bank Nat'l Ass'n v. Gerber, 380 F. Supp. 3d 429, 438 (M.D. Pa. 2018) (Conner, C.J.) (citing Mifflinburg Tel., Inc. v. Criswell, 80 F. Supp. 3d 566, 572 (M.D. Pa. 2015)).

The court will grant DOC defendants' motion to strike to the extent that it seeks to strike Horan's claim of retaliation that occurred after the filing of this lawsuit.  Because this claim seeks to present a "transaction, occurrence, or event that happened after the date" of Horan's original complaint, it is properly construed as a supplemental claim.  See FED. R. CIV. P. 15(d); Garrett v. Wexford Health, 938 F.3d 69, 82-83 (3d Cir. 2019).  Leave of the court is always required for a party to supplement his pleading.  See FED. R. CIV. P. 15(d); Cook v. Condo, No. 1:21-CV-361, 2021 WL 5579706, at *3 n.2 (M.D. Pa. Nov. 30, 2021) (citing Mallinckrodt Inc. v. E-Z EM Inc., No. 09-228, 671 F. Supp. 2d 563, 569 (D. Del. 2009)).  Horan's failure to seek leave to include supplemental claims in his amended complaint renders his retaliation claim arising from conduct that occurred after the filing of his original complaint improper under Rule 15(d).  The court will strike the claim as immaterial

pursuant to Rule 12(f).  Because defendants Dickey and Kline have only been
named as defendants with respect to this claim, they will be dismissed from the
case.

The court will deny DOC defendants' motion to strike in all other respects.
Motions to strike are generally disfavored, <u>Gerber</u>, 380 F. Supp. 3d at 438, and it is
apparent from the face of the amended complaint that the other matters DOC
defendants seek to strike may be summarily dismissed rather than stricken from
the complaint.  First, Horan's claims arising from his placement in SCI-Camp Hill
and the denial of a single cell were previously dismissed with prejudice and Horan
acknowledges that he has included them in his amended complaint solely "to
preserve them for the purpose of appeal."  (Doc. 42 at 1).  Dismissal of these claims
without any further discussion is appropriate.  Second, Horan's claim against
defendant McLothlin is plainly without merit because McLothlin was not acting
under color of state law when he purportedly stole $60 worth of personal property
from Horan.  <u>See</u>, <u>e.g.</u>, <u>Simonton v. Tennis</u>, 437 F. App'x 60, 62 (3d Cir. 2011)
(nonprecedential)[4] (concluding that fellow inmate who assaulted prisoner plaintiff
was not acting under color of state law).  We will therefore dismiss with prejudice,

---

[4] The court acknowledges that nonprecedential decisions are not binding
upon federal district courts.  Citations to nonprecedential decisions reflect that the
court has carefully considered and is persuaded by the panel's *ratio decidendi*.

rather than strike, Horan's claims arising from his placement in SCI-Camp Hill and denial of a single cell and his claims against defendant McLothlin.[5]

The court will also grant Horan's motion to strike defendant Wanga's twenty-six affirmative defenses. At the outset, the court notes that eighteen of the twenty-six "affirmative defenses" asserted by Wanga—affirmative defenses 1, 3, 7-17, 20-21, 23-24, and 26—are not affirmative defenses but rather simply general defenses to Horan's claims. See FED. R. CIV. P. 8(c)(1) (providing non-exhaustive list of affirmative defenses recognized by Federal Rules of Civil Procedure); see also Donohue v. Am. Isuzu Motors, Inc., 155 F.R.D. 515, 518 (1994) ("The difference between a general defense and an affirmative defense is that a general defense negates an element of plaintiff's *prima facie* case, while an affirmative defense excuses the defendant's conduct even if the plaintiff is able to establish a *prima facie* case."). Wanga is certainly able to argue these general defenses in this litigation, but they are not affirmative defenses. See FED. R. CIV. P. 8(c)(1); Gerber, 380 F. Supp. 3d at 439. We will accordingly strike these eighteen "affirmative defenses" as immaterial pursuant to Rule 12(f). See FED. R. CIV. P. 12(f); Gerber, 380 F. Supp. 3d at 439 (striking general defenses improperly characterized as affirmative defenses).

The remaining affirmative defenses do not satisfy the pleading requirements of Federal Rule of Civil Procedure 8(c). To properly plead an affirmative defense, a

---

[5] Although McLothlin has not been served with process and has not responded to the complaint, dismissal of the claims against him is appropriate pursuant to the screening provision of 28 U.S.C. § 1915A.

defendant must "at minimum," provide a concise "'statement of the grounds for asserting an affirmative defense that demonstrates a logical relationship to the lawsuit,' or . . . 'refer to general facts elsewhere in the parties' pleadings.'" <u>Gerber</u>, 380 F. Supp. 3d at 439 (quoting <u>Criswell</u>, 80 F. Supp. 3d at 574). Although the "bare assertion" of an affirmative defense is often sufficient to satisfy the pleading requirements of Rule 8, the party must still assert the affirmative defense "in a way that gives fair notice of that defense." <u>In re</u> <u>Frescati Shipping Co., Ltd.</u>, 886 F.3d 291, 313 (3d Cir. 2018). For an affirmative defense to meet the pleading requirements of Rule 8, "the plaintiff must be able to infer why an affirmative defense may be germane to the litigation based on some general allegations in the pleadings. The facts may be threadbare, but they must be there." <u>Balon v. Enhanced Recovery Co., Inc.</u>, 316 F.R.D. 96, 104 (M.D. Pa. 2016).

The eight remaining affirmative defenses raised in Wanga's answer to Horan's amended complaint plainly fail to meet these pleading standards. Two of the affirmative defenses—affirmative defenses 5 and 25—appear to bear no relation to the facts of this case: affirmative defense 5 states that "Horan is barred from recovering any past medical expenses to the extent Plaintiff has failed to obtain the minimum essential coverage as required by the Affordable Care Act"; affirmative defense 25 pleads the doctrines of "Accord in Satisfaction and Release." (<u>See</u> Doc. 34 at 7, 9). The remaining affirmative defenses—affirmative defenses 2, 4, 6, 18, 19, and 22—state the affirmative defenses of violation of the applicable statute of limitations, limitations on damages under the Prison Litigation Reform Act "PLRA"), failure to mitigate damages and injuries, privilege, duty to act pursuant to

statute or regulation, contributory negligence, comparative negligence, and assumption of risk in conclusory fashion and do not allege any facts in support of the defenses.  (See id. at 6-9).  The affirmative defenses will accordingly be stricken from Wanga's answer because Wanga has failed to state the affirmative defenses in a way that gives Horan fair notice of the nature of the defenses.  See, e.g., Gerber, 380 F. Supp. 3d at 439-40.

> **B.**     **Motion to Dismiss**

The court's analysis proceeds to the merits of DOC defendants' motion to dismiss with respect to the claims that the court previously allowed to proceed or dismissed without prejudice.  We first consider Horan's claim that defendants were deliberately indifferent to the risk that he would be harmed by his cellmates.

Claims of deliberate indifference to a risk of harm require a plaintiff to allege (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was deliberately indifferent to that risk; and (3) the defendant's deliberate indifference caused the plaintiff harm.  Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012) (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994)), *abrogated in nonrelevant part as recognized by* Mack v. Yost, 968 F.3d 311, 319 n.7 (3d Cir. 2020). The first element is an objective inquiry of whether the official "knowingly and unreasonably disregarded an objectively intolerable risk of harm."  Beers-Capitol v. Wetzel, 256 F.3d 120, 132 (3d Cir. 2001).  The second element is subjective: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  Bistrian, 696 F.3d at 367 (quoting Beers-Capitol, 256 F.3d at 125).

Horan fails to state a claim for deliberate indifference to a risk of harm by his cellmates because there is no allegation that the cellmates harmed Horan. First, the amended complaint avers that there was a substantial risk that Bowens, McLelland, and McLothlin would assault Horan, but there is no allegation that any of them actually assaulted him. (See Doc. 32 at 5, 7, 14).

Second, the amended complaint avers that Sarginger and McLelland posed a risk of harm to Horan because they both had communicable diseases—Hepatitis C and COVID-19, respectively—but there are no allegations that either inmate caused Horan to contract the diseases. The amended complaint does not allege that Horan contracted Hepatitis C, and the complaint alleges that Horan and McLelland tested positive for COVID-19 on the same day, February 26, 2021, sixteen days after McLelland was moved into the cell. (See Doc. 32 at 6-7). The allegation that McLelland tested positive for COVID-19 while sharing a cell with Horan is not by itself sufficient to allege deliberate indifference. See, e.g., Zuber v. Sorber, No. 22-CV-3661, 2023 WL 144437, at *4 (E.D. Pa. Jan. 9, 2023).

Third, Horan's allegation that McLothlin stole $60 of personal property from him cannot support a deliberate indifference claim. Deliberate indifference to theft of an inmate's personal property by other inmates does not violate the Eighth Amendment. See, e.g., Hunter v. Sherman, 49 F. App'x 611, 612 (6th Cir. 2002); Wa-Gino v. Ariz. Dep't of Corrs., 94 F.3d 654 (9th Cir. 1996); Brown v. Depot of Pub. Safety & Corr. Servs., 383 F. Supp. 3d 519, 548 (D. Md. 2019).

Finally, the amended complaint does not allege any facts with respect to cellmates Ricketts, Hake, Cook, or Gettemy beyond the fact that they were Horan's

cellmates and that he had unspecified "problems" with Cook.  (See Doc. 32 at 6, 9, 14).

Horan's amended complaint also fails to cure the pleading defects previously identified with respect to his denial of medical care claim.  Claims of inadequate medical care are governed by the deliberate indifference standard.  To state a claim for deliberate indifference, a plaintiff must allege "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (citing Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention."  Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment."  Id. (citation omitted).  A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

Negligence by defendants is not sufficient to establish deliberate indifference to a serious medical need.  Id. at 835.  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are

generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." Palakovic v. Wetzel, 854 F.3d 209, 228 (3d Cir. 2017) (quoting United States ex rel. Walker v. Fayette County, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  It is not appropriate for courts to second-guess the "propriety or adequacy of a particular course of treatment;" such decisions remain questions "of sound professional judgment" that are not considered deliberate indifference.  Id. (quoting Pierce, 612 F.2d at 762).

We previously dismissed Horan's inadequate medical care claim because the factual allegations in the original complaint established that defendants diligently treated all his symptoms and sought to diagnose causes for the symptoms.  (See Doc. 27 at 21-22).  Although it appears that Horan has simply deleted many of these damning allegations from his amended complaint with respect to the period from September 7, 2021 to May 6, 2022, (compare Doc. 1-1 at 10-15 with Doc. 32 at 10-12), he continues to admit that he was given medical attention to treat his symptoms "at least 15 more times" during this period.  Thus, we will dismiss Horan's inadequate medical care claim because the allegations in the amended complaint continue to belie the assertion that defendants provided inadequate medical care to him.  As we previously stated, Horan may disagree with defendants' decisions or believe that he should be receiving more care than he is receiving, but that is not sufficient for the deliberate indifference claim to proceed.  See Palakovic, 854 F.3d at 228 (noting that disagreement as to the adequacy of treatment provided to plaintiff is not sufficient to establish deliberate indifference).

Horan's amended complaint has also failed to cure the pleading defects with respect to Horan's claims against defendants Harry and Fells because the amended complaint fails to allege their personal involvement.  A defendant cannot be liable for a violation of a plaintiff's civil rights unless the defendant was personally involved in the violation.  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 289 (3d Cir. 2018).  The defendant's personal involvement cannot be based solely on a theory of *respondeat superior*.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Rather, for a supervisor to be liable for the actions of a subordinate, there must be allegations of personal direction or actual knowledge and acquiescence.  Id.  A defendant's review and denial of a prisoner's grievance is not sufficient to establish the defendant's personal involvement in an underlying violation of the prisoner's constitutional rights.  Dooley, 957 F.3d at 374.  The complaint does not allege that Harry was personally involved in any of the alleged violations of Horan's civil rights.  Rather, it appears that Horan's claims against Harry are based solely on her role as superintendent and her denial of Horan's grievances, neither of which is sufficient to allege personal involvement.  See id.; Rode, 845 F.2d at 1207.  Similarly, the only allegation of Fells's personal involvement is that she attended a meeting on March 10, 2022, with Horan and several mental health professionals involved in his treatment.  It is not alleged that Fells provided mental health treatment to Horan or that she directed the other defendants to provide deficient mental health treatment to Horan.  Hence, we will dismiss the claims against Harry and Fells for lack of personal involvement.

We will deny the motion to dismiss to the extent it seeks dismissal of Horan's claim that he received inadequate mental health care. Horan has not amended the substance of this claim from his original complaint, and we previously determined that the claim stated a claim upon which relief could be granted. That ruling represents law of the case that we will not disturb in this opinion.

### C.     Leave to Amend

Before dismissing a civil rights complaint for failure to state a claim upon which relief may be granted, a district court must permit a curative amendment unless the amendment would be inequitable or futile. Phillips, 515 F.3d at 245. Leave to amend may be denied based on undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment. Foman v. Davis, 371 U.S. 178, 182 (1962). We find that amendment of the dismissed claims would be futile. Horan has had multiple opportunities to sufficiently state these claims but has failed to do so.

### D.     Joinder

The court will next address whether the claims that have survived DOC defendants' motion to dismiss—Horan's retaliation claim against defendants Butler, Murray, and Jedrzejek; Horan's deliberate indifference claim arising from allegedly insufficient mental health treatment against defendants Gross, Cyrus, and Wanga; and Horan's deliberate indifference to the risk of suicide claim against defendant Gross—should be severed into separate lawsuits because they are misjoined in

violation of Federal Rule of Civil Procedure 20.  (Doc. 12 at 6 n.2).  Under Rule 20, claims against multiple defendants may be joined in the same action only if:

> **(A)** any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

> **(B)** any question of law or fact common to all defendants will arise in the action.

See Fed. R. Civ. P. 20(a)(2).  The decision of whether to sever misjoined claims is left to the discretion of the district court, DirecTV, Inc. v. Leto, 467 F.3d 842, 844 (3d Cir. 2006), and claims may be severed "at any time." Fed. R. Civ. P. 21.  In deciding whether severance is appropriate, the court may consider, *inter alia*, "promotion of the expeditious resolution of the litigation."  Russell v. Chesapeake Appalachia, L.L.C., 305 F.R.D. 78, 81 (M.D. Pa. 2015).

The court previously denied DOC defendants' motion to sever Horan's claims into separate lawsuits without prejudice, finding that severance of the claims at that time would not promote the expeditious resolution of the case because there was "uncertainty as to whether plaintiff [would] amend his complaint and whether the pleading defects identified by the court [would] be remedied by amendment." (Doc. 27 at 28).  The court noted that "[i]f future proceedings demonstrate[d] the necessity of severance, the court [would] sever plaintiff's claims as necessary."  (Id.)

The uncertainty previously cited by the court as a reason not to sever Horan's claims has now been resolved.  As discussed above, only three of Horan's claims will be allowed to proceed: (1) his inadequate mental health care claim against Gross, Cyrus, and Wanga; (2) his retaliation claim against Butler, Murray,

27

and Jedrzejek; and (3) his deliberate indifference to risk of suicide claim against Gross.

Having reviewed the remaining claims pursuant to the standards of Rule 20, we find that severance of the claims into two separate lawsuits is appropriate. Specifically, we find that Horan's inadequate mental health care claim and his deliberate indifference to risk of suicide claim are sufficiently related to one another to be joined in the same lawsuit under Rule 20, but that the retaliation claim against Butler, Murray, and Jedrzejek should be severed into a separate lawsuit. The retaliation claim against Butler, Murray, and Jedrzejek alleges generally that the defendants retaliated against Horan by firing him from his prison job after he filed a grievance complaining that he had received less wages for work than he was due. (See Doc. 32 at 10-13). The claim does not bear any relation to the mental health care claims asserted against defendants Gross, Cyrus, and Wanga. We will sever the claim into a separate case for which plaintiff will be required to file an amended complaint and either pay the requisite filing fee or move for leave to proceed *in forma pauperis*.

## IV.   Conclusion

We will grant in part and deny in part DOC defendants' motion to strike, grant plaintiff's motion to strike, grant in part and deny in part DOC defendants' motion to dismiss, dismiss Horan's amended complaint in part, and sever Horan's retaliation claim against Butler, Murray, and Jedrzejek into a separate lawsuit. Horan will be required to file an amended complaint in the separate lawsuit and either pay the requisite filing fee or move for leave to proceed *in forma pauperis*.

The instant case will proceed solely as to Horan's denial of mental health care claim against defendants Gross, Cyrus, and Wanga and his deliberate indifference to risk of suicide claim against Gross.  Defendants Gross and Cyrus will be required to answer the amended complaint.  The court will issue a case management directive setting forth applicable pretrial deadlines by separate order.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania


Dated:   January 10, 2024