UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

PATRICK HORAN,                          :

              Plaintiff      :    CIV. ACTION NO. 1:22-CV-1166

           v.              :         (JUDGE MANNION)

THADDEUS GROSS, *et al.*,                :

          Defendants       :

## MEMORANDUM

Presently before the court in this prisoner civil rights case are defendants' motions for summary judgment. For the reasons set forth below, the motions will be granted.

## I.    PROCEDURAL HISTORY

Plaintiff, Patrick Horan, filed this case in the Cumberland County Court of Common Pleas on June 23, 2022. (Doc. 1-1). Defendants removed the case to this district on July 27, 2022. (Doc. 1). Upon removal, the case was initially assigned to United States District Judge Christopher C. Conner. Following the resolution of multiple rounds of pleading and motions to dismiss, Judge Conner allowed the case to proceed solely as to: (1) Horan's claim that defendants Gross, Cyrus, and Wanga were deliberately indifferent to Horan's mental health in violation of the Eighth Amendment; and (2)

Horan's claim that Gross was deliberately indifferent to a risk that Horan would commit suicide in violation of the Eighth Amendment. (Docs. 46-47).

The case was reassigned to the undersigned on January 21, 2025, following Judge Conner's retirement from the court. After the close of fact discovery, defendant Wanga filed a motion for summary judgment on May 29, 2025, and defendants Gross and Cyrus filed a separate motion for summary judgment on the same day. (Docs. 76, 79). Briefing on the motions is complete, and they are ripe for resolution. (Docs. 77, 85, 91, 92-93).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 254 (1986); *Aetna Cas. & Sur. Co. v. Ericksen*, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment

stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323-24. The moving party can discharge that burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see also Celotex*, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23; *Jakimas v. Hoffman-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

## III. MATERIAL FACTS[1]

On March 13, 2020, Horan was seen by a psychologist at SCI-Camp Hill. (Doc. 76 ¶13). Horan expressed frustration that he had been transferred to the prison from SCI-Retreat, but he did not express any mental health concerns. (*Id.*) Horan had no recorded mental health diagnosis at this time.

---

[1] Local Rule 56.1 requires a motion for summary judgment to "be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried" and requires that the party opposing a motion for summary judgment file a statement responding to the numbered paragraphs in the movant's statement of material facts, which "shall include references to the parts of the record" that support the nonmovant's opposition to the motion. M.D. Pa. L.R. 56.1. If a non-moving party fails to respond to a moving party's statement in the manner required by Local Rule 56.1, the facts asserted in the moving party's statement are "deemed to be admitted." *Id.* In this case, defendants have filed statements of material facts as required by Local Rule 56.1, (*see* Docs. 78, 86). Horan has filed a response to defendant Gross and Cyrus's statement, (*see* Doc. 91 at 12-16), but has not responded to defendant Wanga's statement. The facts included in defendant Wanga's statement are accordingly deemed admitted for purpose of resolving the motions for summary judgment. M.D. Pa. L.R. 56.1. The court cites directly to defendant Wanga's statement as to any facts included in the statement.

(*Id.*) Horan met with defendant Wanga, a nurse practitioner, on March 18, 2020, to discuss the possibility of being moved to general population. (*Id.* ¶14). Wanga recorded Horan's mental health history, which included a long period of time in which he had not received any medication, a 2005 suicide attempt while he was in county jail, and his self-report of two prior hunger strikes. (*Id.* ¶15). Horan did not report any current mental health concerns, symptoms, or thoughts of self-harm. (*Id.* ¶15). Wanga performed a full mental status exam, ensured that Horan did not have any desire to harm himself, verified that he did not have any mental health prescriptions, and ordered routine follow-up counseling services to address his concerns. (*Id.* ¶16).

On March 18, 2020, a Psychiatric Review Team ("PRT") implemented an Individual Recovery Plan ("IRP") for Horan's mental healthcare in accordance with SCI-Camp Hill policy (*Id.* ¶¶5-6, 17). The PRT verified that Horan had no mental health diagnosis and required no medication, ensured that he was not considering self-harm, and ordered that the psychological staff would follow up with him at least every thirty days. (*Id.* ¶18).

Horan's next contact with the prison's mental health staff was on March 30, 2020. (*Id.* ¶19). Horan expressed no mental health concerns, but again expressed his frustration with being transferred to SCI-Camp Hill. (*Id.*) The

staff member who spoke with Horan ordered more frequent mental health contacts to assist Horan in coping with his housing assignment. (*Id.*)

Horan spoke with defendant Gross, a psychologist in the prison, on April 1, 2020. (*Id.* ¶20). Although Horan was housed in the prison's Residential Treatment Unit at the time, Gross told Horan that he was no longer considered appropriate for placement in that unit because he did not have a recorded mental health diagnosis and was not prescribed any mental health medication. (*Id.*) Horan did not express any mental health concerns to Gross. (*Id.* ¶21). From April 6, 2020, to May 20, 2020, Gross continued to see Horan regularly. (*Id.* ¶22). Horan did not express any mental health concerns to Gross during this period. (*Id.*)

On May 28, 2020, Horan met with Gross to discuss a communication from prison staff indicating that he could not request a transfer out of SCI-Camp Hill for two years. (*Id.* ¶23). Gross offered Horan coping strategies. (*Id.*) Horan responded that he would "play along for a while," then "do his hunger strike," and "go in front of the judge to explain what is going on." (*Id.*) He again reported no mental health concerns. (*Id.*)

On June 3, 2020, Gross evaluated Horan again. (*Id.* ¶24). Horan expressed no mental health concerns and appeared to be in a positive mood.

(*Id.*) Horan told Gross that if he were a denied a transfer for long "he would begin causing problems and litigation against the DOC." (*Id.*)

On July 7, 2020, Horan was assessed by non-party nurse practitioner Bowser. (*Id.* ¶25). Bowser reported that Horan was active, attending yard, reading, making COVID-19 masks for other inmates, and making efforts to obtain an appropriate work assignment. (*Id.*) Horan stated his belief that a prior prescription of psychiatric medication was a "set up" to harass him, declined any need for psychiatric medication, and reported no mental health concerns. (*Id.* ¶26). Horan saw defendant Gross later that day and again reported no mental health concerns. (*Id.* ¶27). Gross nonetheless ordered continued mental health contacts by staff. (*Id.*)

On July 16, 2020, Horan's IRP was updated by a PRT that included defendant Gross Bowser, and licensed psychology manager Jenkins. (*Id.*) Horan reported that he had been "diagnosed with severe depression." (*Id.*) The IRP was changed to address that concern by scheduling regular psychology meetings, out-of-cell time, and access to support services. (*Id.*) Horan, however, expressed no current mental health concerns. (*Id.*)

On July 28, 2020, Horan met with Gross, during which he was informed by a separate prison staff member that he was going to be given a cellmate. (*Id.* ¶30). Horan became highly agitated upon receiving this news and stated

that he would rather be placed in the prison's restricted housing unit than given a cellmate. (*Id.*) Gross stated that he could work with prison staff to find a compatible cellmate, but Horan stated that this was his "line in the sand" and that he would not accept a cellmate. (*Id.*)

On August 11, 2020, Gross again met with Horan at Horan's request. (*Id.* ¶31). Horan "launched directly into his complaints" about being given a cellmate and stated that he should not be at SCI-Camp Hill. (*Id.*) Gross told Horan that he appeared psychologically capable of living with a cellmate. (*Id.* ¶32). Later in the conversation, Horan stated that he "doesn't care what happens" to him and stated that he "has an advance directive in his file." (*Id.* ¶33). Gross interpreted these statements as threats of suicide and spoke with Horan about them, but Horan denied any thoughts of self-harm or suicide. (*Id.*) Gross told Horan that he could be referred to a psychiatrist if he believed that medication could address his concerns. (*Id.*) At that point, Gross reported that Horan "back-peddle[d]" on his mental health concerns and stopped discussing the issue with Gross. (*Id.* ¶34). Horan next spoke with Gross on September 9, 2020, during which he as irritable and stated that he did not want to speak with Gross because Gross would not "do anything for him anyway." (*Id.* ¶35).

8

On October 6, 2020, Horan told Gross that he had Lyme Disease and stated that he should be transferred out of the prison because of that diagnosis. (*Id.* ¶36). Gross checked Horan's medical records and did not find any recorded diagnosis of Lyme Disease. (*Id.*)

On October 13, 2020, Gross met with Horan at Horan's request to discuss a verbal altercation he had with a staff member on the previous day. (*Id.* ¶37). Gross counseled him on how to let go of the situation, calming strategies he could use, and strategies he could use to avoid similar situations. (*Id.*) Horan did not report any mental health concerns. (*Id.*)

On October 20, 2020, Horan met with Gross and told him that he felt mentally stable without medication. (*Id.* ¶38). Horan discussed recurring headaches and related requests that he had submitted to the medical department for care. (*Id.*) Horan then met with a non-party nurse practitioner, Maribeth Bucher, on October 28, 2020, who noted that Horan reported vague mood disturbances related to COVID-19 lockdowns, but otherwise that Horan's mental health was stable and that he was not requesting any new medication prescriptions. (*Id.* ¶39).

Horan met with Gross by request on October 30, 2020, and expressed concerns that prison staff would revoke his Z Code—a housing classification that allowed him a single cell. (*Id.* ¶40). Gross reminded Horan that

revocation of a Z Code was generally done by security personnel and not mental health staff, and that Horan could work with prison staff to ensure that he was placed with a compatible cellmate. (*Id.* ¶40).

On November 5, 2020, Horan met with Bowser and Gross and reported no mental health concerns. (*Id.* ¶41). They instructed Horan to not ruminate on the potential loss of his Z Code. (*Id.*) Horan then met with Gross again on November 13, 2020, during which he appeared agitated and stated that he had begun a hunger strike due to his housing situation. (*Id.* ¶42). Horan had a new cellmate by his next contact with Gross on December 15, 2020, during which Horan noted no mental health concerns. (*Id.* ¶43).

On January 11, 2021, Horan met with Gross and reported no mental health concerns and a stable condition with no need for additional prescriptions. (*Id.* ¶44). Horan reported a similarly stable condition and no mental health concerns to Gross on February 3, 2021. (*Id.* ¶45). Gross then met with Horan at Horan's request on February 10, 2021, to discuss Horan's dissatisfaction with a new cellmate. (*Id.* ¶46). Gross explained that prison policy required inmates who were employed in the kitchen to be housed together. (*Id.*) Horan accepted this response but stated that he would be "filing paperwork over this." (*Id.*)

On March 8, 2021, defendant Wanga entered a late note into Horan's records indicating that he had met with Horan the previous week. (*Id.* ¶47). Wanga noted that Horan had not been prescribed any psychiatric medication for a long time and that he was not currently prescribed any. (*Id.*) Wanga further noted that Horan described situational dissatisfaction with his housing status and the loss of his Z Code. (*Id.*) Wanga performed a full mental status exam, ensured that Horan was not considering self-harm, and ordered a routine follow-up. (*Id.* ¶48).

On March 18, 2021, Horan met with a PRT consisting of defendants Gross and Wanga and nondefendant psychology manager Plotica. (*Id.* ¶49). Horan did not express any mental health concerns, but complained about his housing situation. (*Id.*) The PRT noted that Horan did not have a current mental health diagnosis, but that continued care was necessary because a court had previously convicted him of being guilty but mentally ill ("GBMI") in his state criminal proceedings. (*Id.*) Gross's notes from the meeting indicated that Horan refused to discuss his mental health but stated that he was "going to have to become aggressive" with his cellmate if his Z Code was not restored. (*Id.*) Horan next spoke with Gross on April 9, 2021. (*Id.* ¶51). Gross reported that Horan was in a cheerful mood, had no mental health concerns, and appeared to be getting along well with his cellmate. (*Id.*)

On May 18, 2021, Horan met with Gross and expressed no mental health concerns but complained about his work assignment. (*Id.* ¶52). Gross noted that Horan was using positive coping skills. (*Id.*) Horan similarly expressed no mental health concerns, stated that his mental health was stable, and presented in a positive mood when he met with Gross on June 25, 2021. (*Id.* ¶53).

Horan met with a PRT consisting of Wanga, Gross, and several other staff members on July 8, 2021. (*Id.* ¶54). Horan did not express any mental health concerns other than stress related to his attempts to be transferred out of SCI-Camp Hill and to secure privileges such as gym admittance, a new mattress, and a work assignment. (*Id.*) Horan met with Gross again on July 19, 2021, and expressed no mental health concerns but complained about his medical, housing, and employment situations. (*Id.* ¶55).

On August 11, 2021, defendant Wanga met with Horan. (*Id.* ¶56). Horan complained about his placement in SCI-Camp Hill and discussed the possibility of suing the prison, but did not express any mental health concerns or thoughts of suicide. (*Id.*) Wanga reviewed Horan's current prescriptions, assessed his mental health status, and determined that he was mentally stable. (*Id.* ¶57). Wanga ordered routine follow-up care. (*Id.*)

On August 24, 2021, Horan met with Gross and stated that he had an upcoming court hearing during which he hoped the court would order that he be transferred to a different prison. (*Id.* ¶58). Horan did not express any mental health concerns. (*Id.*) Horan similarly expressed no mental health concerns when he met with Gross on October 1, 2021, and November 2, 2021. (*Id.* ¶¶59-60).

On November 12, 2021, Horan met with a PRT and expressed no mental health concerns. (*Id.* ¶61). Horan stated that he was dissatisfied with his medical treatment and medication that had previously been prescribed pursuant to his medical treatment but had been discontinued after he had refused to take it. (*Id.*) Horan similarly expressed dissatisfaction with his medical care during a meeting with Gross on December 1, 2021. (*Id.* ¶62).

On December 5, 2021, Horan was evaluated for the first time by Dr. Andrew Newton, a psychiatrist in the prison. (*Id.* ¶63). Newton recorded that Horan had a stable mood, no suicidal or homicidal ideation, and general complaints of full-body pain that Horan attributed to a previous COVID-19 infection. (*Id.*)

Horan next met with Gross on January 3, 2022. (*Id.* ¶64). He expressed frustration with his medical care, related physical therapy, work assignment, and cellmate, but did not express any mental health concerns. (*Id.* ¶64).

Horan similarly expressed no mental health concerns and displayed stable mental health when he met with Gross on February 9, 2022. (*Id.* ¶65).

On February 24, 2022, a nurse entered a non-urgent referral for Horan to be seen by a member of the psychology staff based on stress he was experiencing from a misconduct charge he received and his employment situation. (*Id.* ¶66). Gross came to Horan's cell on February 25, 2022, and discussed the stress Horan was experiencing. (*Id.* ¶67). Gross offered Horan coping strategies and ensured that he did not pose a risk of suicide and that he was not in acute mental health distress. (*Id.*)

On March 1, 2022, Horan spoke with Gross, and stated that SCI-Camp Hill could not give him appropriate mental health care because of his previous GBMI conviction. (*Id.* ¶68). Horan threatened legal action or a hunger strike. (*Id.*) Gross recorded that Horan had not had a mental health diagnosis for years, was capable of caring for himself, and had not expressed any mental health concerns during routine visits. (*Id.*)

On March 7, 2022, Horan spoke with non-defendant registered nurse Behe, and expressed his ongoing complaints about housing, work, and alleged retaliation. (*Id.* ¶69). Horan stated that he wished to be transferred to SCI-Mahanoy because it was a "mental health facility," but did not state what mental health care he believed he was not receiving at SCI-Camp Hill.

14

(*Id.*) Horan expressed passive suicidal ideation during this interaction for the first time during his incarceration at SCI-Camp Hill, and stated that he was experiencing headaches, nightmares, and stress. (*Id.* ¶70). Horan was resistant to Behe's treatment suggestions and declined consideration for medication, but accepted a referral to the psychology department. (*Id.* ¶71).

Per Behe's suggestion, a PRT consisting of Wanga and other officials met with Horan on March 10, 2022. (*Id.* ¶72). Horan threatened legal action, but offered "little to no input" as to what treatment he was being denied. (*Id.* ¶73). The PRT noted that Horan expressed no mental health concerns and accordingly made no adjustment to his treatment plan. (*Id.*)

On April 18, 2022, Horan met with Gross and expressed frustration with his requests to be transferred to another prison but stated that he had no mental health concerns. (*Id.* ¶74). Horan next met with Gross on May 16, 2022, during which he discussed ongoing issues with his cellmate but denied that he had any suicidal ideations. (*Id.* ¶75).

On June 15, 2022, Horan met with Behe, who asked him about the perceived lack of mental health treatment. (*Id.* ¶76). Horan told Behe that the denial of a single cell made him feel "disrespected." (*Id.*) Behe noted that Horan expressed no suicidal ideations, but that he said he "would rather die than be in this jail." (*Id.* ¶77). Behe conducted a full assessment of Horan's

mental health, noting that he was irritable but that he was not delusional or suicidal and presented within normal mental limits. (*Id.* ¶78). Behe recorded that Horan was "minimally receptive" to her encouragement to use coping skills and recorded that he was not interested in medication. (*Id.* ¶79).

Horan filed his complaint in this case on June 23, 2022, in the Cumberland County Court of Common Pleas. (*Id.* ¶80). On July 14, 2022, Horan was assessed for possible placement in the diversionary treatment unit, a housing unit dedicated to mental health treatment. (*Id.* ¶81). The member of the psychological staff who assessed him noted that he did not pose a suicide risk, had no suicidal ideations, presented no mental health complaints, had no symptoms of psychosis, depression, anxiety, or aggression, and was not prescribed any psychiatric medication. (*Id.*) Horan reported that he "cut his wrist in April 2020," but the staff member noted that he had not sought any medical care for the injury. (*Id.* ¶82). The staff member placed Horan in the DTU and ordered daily contact with psychological staff, out-of-cell therapy every fourteen days, various group therapy opportunities, and weekly meetings with a Program Review Committee ("PRC"). (*Id.* ¶83).

The next day, Horan was seen by a PRT consisting of Wanga and other individuals. (*Id.* ¶84). The PRT noted that Horan did not have any

16

psychiatric diagnosis or prescription, but updated his safety plan in light of his reports of previous self-harm. (*Id.*)

Horan attended the majority of group therapy sessions available to him in July 2022, and was recorded as being active and attentive during the sessions. (*Id.* ¶85). Horan saw Gross again on August 1, 2022, and reported auditory hallucinations for the first time. (*Id.* ¶86). Gross attempted to discuss the hallucinations with Horan, but Horan turned the conversation to an unfavorable grievance response he had recently received. (*Id.* ¶87). Horan then expressed no mental health concerns to a different psychological staff member later that day. (*Id.* ¶88).

On August 8, 2022, a member of the psychological staff met with Horan and recorded that he had no mental health symptoms and was instead concerned with his housing status. (*Id.* ¶89). The staff member asked Horan what he wanted from the psychology department and Horan stated "do whatever you can to get my transfer" but did not describe any additional mental health treatment he needed. (*Id.* ¶90). Horan similarly expressed no mental health concerns when meeting with a psychological staff member on August 29, 2022, but requested that the staff member hand deliver a request to the prison's property officer. (*Id.* ¶91).

On August 31, 2022, Horan met with psychological staff and spent "little time talking about mental health." (*Id.* ¶92). Horan's complaints focused on his housing status, but he mentioned that he had cut his wrist in April 2020 and hid it from staff members by bandaging himself and wearing long sleeves. (*Id.*) Horan was offered six sessions of group therapy in August 2022, but declined to attend any of them. (*Id.* ¶93).

On September 2, 2022, registered nurse Lisa Rovelli spoke with Horan at his request. (*Id.* ¶94). Rovelli noted that he had no mental health diagnosis or prescription and that his focus during the discussion was on property disputes. (*Id.*) Rovelli talked with Horan about his continued refusal to attend group therapy and recreational activities, and Horan stated that these opportunities were "not productive" for him. (*Id.*) Rovelli noted that Horan persisted in "chronic manipulative and entitled behavior." (*Id.*) Rovelli also noted that she had reviewed his criminal records and that his GBMI status had been revoked by a state court judge when he changed his plea to no contest in a 2014 hearing. (*Id.* ¶95). Pennsylvania state court records confirm this action. *See*, *e.g.*, *Commonwealth v. Horan*, 284 A.3d 898, No. 2363 EDA 2021, 2022 WL 3149326, at *1 (Pa. Super. Ct. Aug. 8, 2022). Horan was seen by psychology staff again on September 23, 2022, who noted that he denied any mental health concerns and declined an individual therapy

session. (Doc. 78 ¶96). The staff member who conducted the interview informed Horan that he would be transferred to another prison soon and noted that Horan "seemed to be pleased by this." (*Id.*)

Horan was transferred to SCI-Huntingdon in September 2022. (*Id.* ¶97). Horan expressed no mental health concerns during his intake at SCI-Huntingdon, but reported that he had a GBMI status and that he had previously attempted suicide. (*Id.*) On October 4, 2022, Horan was seen by a registered nurse and reported no mental health concerns and admitted that he was not presently in GBMI status. (*Id.* ¶98). The nurse indicated that Horan's mental health designation would be downgraded given the absence of mental health concerns or GBMI status. (*Id.*) Horan's status was downgraded, and after several visits in the ensuing months during which he expressed no mental health concerns, showed stable mood, and showed no need for medication or individual therapy, he was removed from the active mental health roster at SCI-Huntingdon in November 2022. (*Id.* ¶¶99-100).

## IV. DISCUSSION

Plaintiff's claims are filed pursuant to 42 U.S.C. §1983. Section 1983 authorizes redress for violations of constitutional rights and provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . .

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. §1983. Thus, to establish a successful claim under Section 1983, a plaintiff must demonstrate that the challenged conduct was committed by a person acting under color of state law and deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997). By its terms, Section 1983 does not create a substantive right, but merely provides a method for vindicating federal rights conferred by the United States Constitution and the federal statutes that it describes. *Baker v. McCollan*, 443 U.S. 137 (1979).

Horan's claims allege deliberate indifference to a serious medical need and deliberate indifference to a risk of suicide in violation of the Eighth Amendment. To succeed on his deliberate indifference to a serious medical need claim, Horan must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring

treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "A plaintiff's mere disagreement as to the proper medical treatment" is not sufficient to support a deliberate indifference claim. *Lanzaro*, 834 F.2d at 346.

To succeed on his deliberate indifference to a risk of suicide claim, Horan must show (1) that he had a particular vulnerability to suicide, meaning that there was a strong likelihood he would attempt suicide rather than a mere possibility; (2) that defendant knew or should have known of his particular vulnerability to suicide; and (3) that defendant acted with reckless or deliberate indifference to his vulnerability to suicide. *Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017). Knowledge of a plaintiff's particular vulnerability to suicide may be shown by, for example, evidence that defendant knew that plaintiff had a history of suicide attempts. *Id.* at 222-23.

Here, the record before the court plainly shows that defendants are entitled to summary judgment. Defendant Wanga's uncontroverted statement of material facts shows that Horan received extensive mental health treatment throughout his incarceration in SCI-Camp Hill, despite his repeated indications that he had no mental health concerns, and that defendants responded appropriately to any perceived risks of suicidal behavior. Horan has not produced any evidence to controvert these facts and instead simply relies on the unsupported allegations in his complaint.[2] (*See generally* Doc. 91). This is plainly insufficient to create a genuine issue of material fact at the summary judgment stage. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103 (3d Cir. 1985))). The court will accordingly grant both motions for summary judgment because the uncontroverted factual record shows that there is no genuine

---

[2] As noted above, Horan has responded to defendant Gross and Cyrus's statement of material facts, but has ignored defendant Wanga's statement.

22

dispute of material fact and that defendants are entitled to judgment as a matter of law.[3]

## V.    CONCLUSION

For the foregoing reasons, the court will grant defendants' motions for summary judgment and close this case. An appropriate order shall issue.


Malachy E. Mannion
**United States District Judge**

**Dated:** *1/7/26*
22-1166-01

_____

[3] Defendants Gross and Cyrus have additionally argued that they are entitled to summary judgment because Horan failed to exhaust administrative remedies. The court does not reach this argument because it concludes that summary judgment is warranted on the merits of Horan's claims.